**Ray MCGUIRE, Plaintiff,**

v.

**Kenneth APFEL, Commissioner of the Social Security Administration, Defendant.**

**No. 99–4063–RDR.**

United States District Court, D. Kansas.

Feb. 16, 2001.

Steven M. Tilton, Tilton & Tilton, LLP, Topeka, KS, for plaintiff.

Mary K. Ramirez, Office of U.S. Attorney, Topeka, KS, for defendant.

### MEMORANDUM AND ORDER

ROGERS, District, Judge.

This case is now before the court upon plaintiff's appeal from the denial of his application for social security disability benefits and supplemental security benefits. Plaintiff asserts that he has been disabled from substantial gainful employment since October 17, 1991. He filed the application leading to this appeal on January 17, 1997.

Plaintiff was born in 1956. He did not finish high school. But, he has a GED which he achieved after multiple attempts. He has worked as an oil field worker, a farm tractor driver, a grocery store "facer" and a fast food cook.[1]

Plaintiff asserts that the following conditions alone or, more probably, in combination have rendered him disabled from employment: degenerative disc disease; high blood pressure; degenerative spondylolysis; depression; low intelligence; double vision; and dysthymia.

The Administrative Law Judge (ALJ) determined that plaintiff could not return to his former employment, but that he could perform light and sedentary employment which exists in substantial numbers in the economy. The Commissioner has adopted this decision as the basis for denying benefits to plaintiff.

Plaintiff is 5′9½″ and weighs approximately 210 pounds. He has weighed more and has had some difficulty with weight control. He has been married for many years. He has three children who lived at home with plaintiff during the time period in question. Plaintiff's wife works as a certified nurse's aide.

Plaintiff has a driver's license and is able to drive. Plaintiff's last job was as a fast food cook in 1996. He lost this job when the restaurant closed, although plaintiff was prepared to quit because the job required him to stand and bend too much. He worked there four to eight hours for

---

1. A "facer" pulls cans and packages off shelves at a grocery store.

five to six weeks. His employment as a "facer" lasted two weeks. This was also in 1996. Plaintiff said the standing required in the job was more than he could suffer. In 1993, he was employed as a farm tractor driver for approximately four months. Plaintiff's last full-time work was as an oil field worker in 1991. He hurt his back lifting pipe on this job. He quit October 17, 1991. Before that, he worked in a lumber yard.

Plaintiff has back pain. He describes it as a grinding or stabbing pain in his lower back and a burning pain in his middle back. He testified that he can sit comfortably in a chair for 10 minutes at a time. He then uses his arms to hold himself up. Sometimes plaintiff has neck stiffness which lasts for four to six hours. Plaintiff estimated that he could walk for only half a block before needing to rest. He said he can sit without needing to stand up for 15 minutes to an hour.

Plaintiff stated that he runs hot water on his back two to three times a day to relieve his back pain. He takes Tylox and Flexidril, although these medicines make him sleepy. He also sits in a recliner approximately eight hours a day.

Plaintiff said he suffers from double or split level vision at least once a day, particularly when he tries to read or look at something close. This problem usually lasts for 45 minutes to an hour. Plaintiff describes this as exhausting.

Plaintiff testified that he cannot grip at all with his hands because they hurt all the time. He thinks he has arthritis in his hands, although a doctor has never made that diagnosis.

Plaintiff has high blood pressure. This condition has been documented since 1991. He does not take medication anymore because it is too expensive. Sometimes plaintiff has chest pain, although no heart attack or significant heart problem has been discovered. Plaintiff's back pain extends to his legs when he is driving or sitting very long. The pain is so bad that he cannot do dishes for more than ten minutes on most occasions. Plaintiff cannot bend or twist. At times he needs help getting dressed. He cannot bend to dry his legs with a towel after a shower. He can vacuum a small room and do a small amount of cooking.

Plaintiff testified that he falls down quite often. Generally, his left side gives way. When he does grocery shopping with his wife, he uses the cart to hold himself up. Plaintiff uses a cane, although one has not been prescribed.

Plaintiff described problems with depression which he said cause him to cry almost every day. He has not sought treatment for this problem. Plaintiff visits his parents on weekends. Plaintiff told the ALJ that he does not visit friends. He does not attend church, participate in hobbies or engage in outside activities.

Plaintiff made an application for benefits in 1994. When it was denied, he did not appeal. But, he believes his condition has gotten worse and worse.

As of November and December 1991, plaintiff's treating physician, Dr. Fermo, believed that plaintiff's "osteoarthritis" in his back was a permanent condition which substantially limited his employment capabilities. (Tr. 419). After an evaluation, Dr. Tejano stated in November 1991:

> He can walk on his toes and heels without difficulty. Straight leg raising test, Patrick's test negative. The deep tendon reflexes are present equal normal on both sides. No evidence of motor or sensory deficit.

> X-ray of the lower back showed nothing much significant, and no evidence of any arthritic changes, very minimal narrow-

ing at L5–S1, except the area at T10–T11, T11–L1 showed a mild to moderate degenerative arthritis. This is where the pain is coming from. If he does a lot of lifting and bending, it will cause pain.... I don't think there is therapy or any other medication would change the arthritic changes at T10–T11, T11–L1. Any job that doesn't require an excessive amount of lifting and bending would be better for him rather than going back to heavy lifting and bending because of those changes. Feldene and Norflex will be recommended as symptomatic relief.

(Tr. 368). Dr. Tejano followed this evaluation with a letter dated December 14, 1991 which stated:

Sammy Ray McGuire was seen. at the clinic for an evaluation. He is still complaining of a lot of pain. There is really nothing much we can do. The only way is to probably encourage him to be retrained for any job that doesn't require heavy lifting and bending.... When you have advanced arthritic changes like he has in his back, there is no way to just monkey around and try to put him on jobs with some limitations, mainly because it is not going to get any better. The changes are there and after a few years x-rays are going to show the arthritic changes are becoming worse. So, instead of just giving him therapy or putting off doing anything to him, I think he needs to go ahead and get started in some job training that doesn't require the heavy activity required in his present job.

(Tr. 190).

When examined by Dr. Philip Mills in January 1992, plaintiff's range of motion was full; there was no muscle spasm; straight leg raising was negative. There was some tenderness in the back area, but Dr. Mills placed few restrictions upon plaintiff other than in bending. Plaintiff's hands and feet were considered capable of a full range of repetitive actions. (Tr. 193–94).

Dr. Luther Fry examined plaintiff in October 1992 with regard to his complaints of double vision (diplopia). He indicated that this problem developed when plaintiff was tired, but "[i]t looks like he is not bothered too much so I don't think any specific treatment would be indicated." (Tr. 386).

Dr. Chris Slater made an evaluation of plaintiff in March 1994. At that time plaintiff complained of lower and mid-back pain, as well as wrist pain, finger stiffness and knee pain. Plaintiff termed it "arthritis all over." (Tr. 197). Plaintiff said he could lift 50 to 60 pounds, he could sit for 15 minutes and stand for 15 minutes and that he could carry 25 to 50 pounds. Dr. Slater found some tenderness in the back area and some muscle spasm. He further noted:

Patient had diminished range of motion with flexion of approximately 90 degrees, side bending left and right was 15 degrees. Neck flexion was mildly diminished at 60, extension 15 degrees, rotation left and right was 40 degrees, side bending left and right was approximately 25 degrees. There was full range of motion of all other extremities. Mild crepitus was noted in the knees bilaterally but quite minimum without increased symptomatology. There was a full range of motion. Negative straight leg raising bilaterally. No cyanosis, clubbing or edema.

... Minimal diminished hand grip of the right at ☜% and ☜% of the left. This appeared satisfactory with no atrophy of the muscle groups....

[X-ray] report of lumbar spine ... did show degenerative changes of T12, L1, L2 with prominent spur formation in

these areas. Disk spaces were well maintained. (Tr. 200).

Plaintiff has a history of hypertension. The control of this problem has fluctuated. One barrier has been the cost of blood pressure medication. (Tr. 429). Plaintiff was hospitalized with chest pain in June 1994. This was considered secondary to gastroesophageal reflux disease. (Tr. 431).

Plaintiff was hospitalized in August 1995 with low back pain so severe he could hardly get out of bed. (Tr. 442). X-rays showed degenerative spondylitis with disc narrowing at T–12–L1, L1–L2 and L5–S1. (Tr. 443). Plaintiff had a similar experience in June 1996. (Tr. 440).

Plaintiff was examined by Dr. Roger Trotter on February 28, 1997. At that time, plaintiff complained of pain in the back and shoulders; elbow, knee and ankle pain; and tingling in his face and head. (Tr. 505). Upon examination, Dr. Trotter found:

> [E]lbows and wrists were normal. Shoulders were pretty much normal. There was just a little bit of limitation of motion in flexion bilaterally and in abduction, maybe about a 20–degree reduction, and there was some crepitance noted in the shoulders. BACK: he could flex to about 20 degrees, extend to about 5 degrees, and left and right lateral bend to about 5 degrees. He walked with kind of a stooped gait. Grip strength was somewhat diminished. He had slow rapid hand motions, i.e., repetitive fine motions. I think there was a certain amount of exam error here. He may have been trying hard but it was hard to tell how hard he was trying.... Range of motion of the joints was all normal except for some minimal limitations in the shoulders. There was no sign of enlargement, effusion, heat, tenderness, swelling, instability, or deformity.

> Mental status

> He was totally conversant and oriented and did not seem to have any problems.... He carried on a very adequate conversation. He had a very good memory.

> In terms of work related activities, he possibly could do something sitting but he would probably get a tight and sore back. Standing, walking, lifting and carrying would be difficult for him, I think, because of his back. Handling of objects would be difficult for him because of his hands.

(Tr. 506). No visual limitations were established during this examination. (Tr. 506 & 511).

In June 1998, a consultative examination was performed by Dr. Mark Goodman, a psychologist. Dr. Goodman found moderate depression which affected plaintiff's physical functioning; mild dysthymia was also diagnosed. (Tr. 531). Plaintiff has a performance IQ of 92 which placed him at the upper end of the low average range of intelligence. Dr. Goodman found that plaintiff "should be able intellectually to follow simple oral instructions, carry out instructions under ordinary supervision, relate appropriately to co-workers and supervisors, meet quality standards, meet production norms, and sustain work with adequate attendance provided that his physical condition will allow him to do this." (Tr. 530).

■ We review the decision to deny benefits in this case "to determine whether it is supported by substantial legal evidence and whether correct legal standards were applied." *Qualls v. Apfel,* 206 F.3d 1368, 1371 (10th Cir.2000). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate

to support a conclusion.'" *Id.*, quoting *Soliz v. Chater,* 82 F.3d 373, 375 (10th Cir.1996).

■ Plaintiff makes several claims of error by the Administrative Law Judge (ALJ) in this case. First, plaintiff claims that the ALJ did not properly consider all of plaintiff's impairments. Initially, plaintiff asserts that the ALJ did not consider plaintiff's depression. However, the ALJ completed the psychiatric review technique form (PRTF) and discussed Dr. Goodman's report in his decision. (Tr. 21–2, 23–5, 32–35). He concluded on the form that plaintiff had an affective disorder but there was only an infrequent limitation upon plaintiff's functional capacity. (Tr. 34). This conclusion appears consistent with Dr. Goodman's consultative examination quoted above. Dr. Goodman stated that plaintiff could follow instructions and supervision and that he could relate to co-workers and sustain attendance. We believe the ALJ did consider plaintiff's depression in rendering his decision.

Next, plaintiff contends that the ALJ did not consider plaintiff's vision problems. However, the ALJ mentioned this issue in his decision and determined there was no objective evidence of any impairment. (Tr. 23, 27). The ALJ also questioned the credibility of plaintiff's vision complaints. Contrary to plaintiff's contention, the ALJ clearly considered this issue.[2] Plaintiff also contends that the ALJ failed to consider plaintiff's hypertension. The ALJ's decision, however, discusses plaintiff's blood pressure, noting that although plaintiff has not been taking blood pressure medication, the most recent records show

his blood pressure at a noncritical level. (Tr. 27). See also discussion at (Tr. 23).

Finally, plaintiff asserts that the ALJ did not adequately consider plaintiff complaints of chest pain and cardiac impairment. The ALJ asked about chest pains during the hearing. (Tr. 60). Plaintiff stated that the chest pains happen "quite a bit;" that EKGs have not found a problem; and that he has not been given medication for the chest pains. In his decision, the ALJ discussed an episode of chest pain in June 1994. (Tr. 19). Obviously, he considered the evidence.

We do not believe a most extensive discussion of this issue was required. The record shows episodes of chest pain in 1992 and 1994. Plaintiff was hospitalized in 1994 when he complained of chest pain. (Tr. 203). The diagnosis was "chest pain secondary to gastroesophageal reflux disease with esophagitis" and a "possibility of coronary artery disease." (Tr. 205). But, chest pain is not one of plaintiff's "chief complaints." (Tr. 528). Plaintiff denied that he had chest pain during a hospital visit in 1998. (Tr. 516). A normal heart is found in most of the examinations in the record. (E.g., Tr. 204, 506 and 522).

■ The Tenth Circuit holds that: "The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evi-

2. Plaintiff suggests that it is "possible" that he may have a mild case of Myasthenia Gravis. But, Dr. Fry stated only that plaintiff's symptoms in 1992 "sound a little bit like Myasthenia Gravis with intermittent diplopia as a result of this." (Tr. 386). The record does not indicate that plaintiff's vision problems were ever sufficiently severe that further diagnosis or testing was pursued. We do not believe there are adequate grounds in the record to fault the ALJ for failing to ask for further examination or further information on this point.

dence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1009–10 (10th Cir.1996) (citation omitted). In this instance, we do not believe the failure of the ALJ to more extensively discuss the chest pain evidence was a critical omission in the ALJ's review of this case. We do not believe the chest pain evidence is significantly probative to plaintiff's claim of disability.

■ Plaintiff's next contentions are that the ALJ erroneously evaluated plaintiff's allegations of pain. Plaintiff faults the ALJ's analysis in two ways: first, plaintiff asserts that the ALJ did not mention or apply the Luna standard (from *Luna v. Bowen*, 834 F.2d 161 (10th Cir.1987)) in his decision; second, plaintiff asserts that the ALJ incorrectly made credibility determinations. The court rejects the first point. The ALJ did mention the Luna standard in his decision. (Tr. 18). Luna discusses factors which the ALJ should consider in evaluating subjective complaints of pain. It is clear from our review of the ALJ's opinion that the ALJ followed Luna in making his decision. The ALJ found a nexus between the proven impairment in this case and the pain alleged. (Tr. 25) ("claimant has a spinal impairment that could reasonably be expected to produce some of the pain and other symptoms alleged . . ."). He also considered many factors to determine whether plaintiff is disabled by the pain that is produced by the impairment. These factors included plaintiff's activities, attempts to receive treatment, psychological factors, and medication.

■ Plaintiff's somewhat more viable argument is that the ALJ erroneously evaluated the record in determining the credibility of plaintiff's subjective complaints of pain. The ALJ discredited plaintiff's descriptions of his degree of limitation and pain for the following reasons: 1) lack of substantiating medical findings

with regard to grip strength, inflammation, swelling, range of motion, or reflex deficits; 2) inconsistent statements regarding daily activities; 3) the statement of a neighbor, Susan Mills, regarding plaintiff's activities; 4) plaintiff's own testimony regarding his actions; and 5) plaintiff's work record.

■ The ALJ's credibility findings require the court's deference and must not be upset if they are supported by substantial evidence. *Winfrey v. Chater*, 92 F.3d 1017, 1020 (10th Cir.1996). Plaintiff does not deny the medical evidence regarding grip strength, swelling, range of motion, etc. Plaintiff does not deny that there is some inconsistency between plaintiff's account of his daily activities when he testified before the ALJ on April 16, 1998 and his written account of his activities in 1994. In 1994, plaintiff stated that: he cooked a meal twice a week; he spent eight hours a week helping to care for his children; he did chores outside for two hours a week (e.g., riding a lawn mower); he shopped for groceries twice a month; he drove a car; and he visited other people's homes. (Tr. 118–123). Plaintiff's description of his activities before the ALJ is significantly different.

Plaintiff contends that he suffers from degenerative conditions and, therefore, the deterioration of his physical status explains any difference in the descriptions of his normal activities. But, the only proof offered is the use of the word "degenerative" in the medical records. Persuasive evidence of the pace or degree of deterioration is not present in the record. There do not appear to be medical signs of a worsening condition, other than a possible impairment in plaintiff's ability to use his hands.

Susan Mills signed a statement indicating that she had known plaintiff for over

five years and had seen him once or twice a week during that time. She said that she worked with plaintiff's wife. Her statement, which was completed in 1997, indicates that: plaintiff worked on cars; he did 85% of his cooking; he did general cleaning; he often went outside the home; he read books and magazines; he visited his parents once a day; he usually finished work, though sometimes back trouble delayed his progress. (Tr. 343–347).

Plaintiff has responded with statements from plaintiff's father and Susan Mills' son. These statements contradict Ms. Mills' account. They indicate that: plaintiff's father works on cars and plaintiff stays in the house, usually sitting in a recliner; plaintiff is inactive and usually watches TV or plays a computer game; and plaintiff does not read. (Tr. 566–67). While these letters add a confusing element to the record, the court does not believe they detract significantly from the substantial evidence supporting the ALJ's credibility determination.

The ALJ believed plaintiff's cooking and driving activities undercut his alleged vision difficulties. He considered plaintiff's 106–mile drive to the hearing a fact which countered plaintiff's claim that he cannot sit without changing position for more than 15 minutes at a time, even though plaintiff stopped twice during the trip. The ALJ was suspicious of plaintiff's use of a cane at the hearing, when a cane was not prescribed by a doctor and plaintiff's alleged problems with falling had no documented medical cause. The ALJ doubted that sleepiness was a problem from plaintiff's medication when plaintiff had not reported that problem to doctors. Finally, the ALJ considered plaintiff's work record somewhat spotty and not indicative of a person who was strongly motivated to be employed.

Plaintiff has alternative rationales for many of these points. For example, he suggests that if his work history is "poor," it is because of low wages and plaintiff's psychological and intellectual impairments. A cane does not have to be prescribed and may become necessary for a "degenerative" condition. Plaintiff was not asked by the ALJ if he reported the side effects of medication to his doctors.

The court has considered all of these arguments. We conclude that while the record may be susceptible to a different but nevertheless reasonable construction, plaintiff's arguments are not sufficient to eliminate the substantial basis supporting the ALJ's credibility determination.

■ Plaintiff's next argument is that the ALJ erroneously determined plaintiff's residual functional capacity. The ALJ concluded that: plaintiff could lift or carry up to 20 pounds occasionally and up to 10 pounds frequently; plaintiff could sit up to 6 hours and stand or walk that amount of time; and plaintiff was limited to no more than moderate bending or stooping. (Tr. 28). In reaching this determination, the ALJ relied upon the residual functional capacity assessment completed in March 1997 and signed by Dr. Berner. (Tr. 508–515).

Plaintiff criticizes this conclusion first for failing to account for the alleged progressive worsening of plaintiff's condition. Second, plaintiff asserts that the opinion of Dr. Berner, a non-examining physician, is entitled to little weight. Finally, plaintiff contends that the treating and examining physicians in this case rendered more restrictive interpretations of plaintiff's functional capacity.

These criticisms are not convincing to the court. As stated earlier, while plaintiff may suffer from a degenerative condition, there is no clear medical evidence of deterioration in the record. For instance, the

objective findings made by Dr. Slater in 1994 do not appear significantly different from the findings of Dr. Trotter in 1997. Accordingly, it is impossible to conclude, for instance, that plaintiff could lift fewer pounds in 1998 than he could in 1997. The ALJ obviously considered the entire record. So has this court. We do not believe the ALJ's conclusions regarding plaintiff's residual functional capacity can be turned aside simply because plaintiff has a degenerative spinal condition.

If the opinion of a non-examining consultative physician was much different from the opinions of the treating and examining physicians in this case, the court would consider plaintiff's attack upon the ALJ's residual functional capacity analysis more seriously. In this case, however, the court sees little difference between the conclusions in Dr. Berner's report and the conclusions of Dr. Tejano (Tr. 368), Dr. Fermo (Tr. 414), and Dr. Mills (Tr. 193).

 Plaintiff asserts that the ALJ should have paid more attention to the conclusion of Dr. Trotter after a consultative examination. However, Dr. Trotter's remarks that plaintiff "would probably get a tight and sore back" from sitting and that standing, walking, lifting, carrying, and handling objects would be "difficult" do not subvert the ALJ's conclusion in this case for three reasons. First, the remarks are not supported by objective medical findings. Dr. Trotter's objective findings are not significantly different from the findings made by Dr. Mills in 1992. Second, the possibility of exam error casts doubt upon plaintiff's difficulty with fine motor skills. Finally, the issue in this case is not what work plaintiff can perform painlessly, but what work plaintiff can reasonably do given his physiological and psychological impairments. The inability to work pain-free is not a sufficient reason to find a claimant disabled. See Gossett v. Bowen, 862 F.2d 802, 807 (10th Cir.1988).

 Next, plaintiff asserts that the ALJ erred in establishing plaintiff's mental functional limitations. Plaintiff contends that the ALJ ignored evidence in the record from Dr. Goodman that plaintiff suffered from moderate depression and mild dysthemia. (Tr. 531). He further contends that the ALJ construed Dr. Goodman's report in a one-sided manner. The court has reviewed Dr. Goodman's report and the ALJ's psychiatric review technique form. While the report has material which may be construed in favor and against a finding of disability, the court believes it was fairly considered by the ALJ in determining plaintiff's residual functional capacity. The part of Dr. Goodman's report previously quoted in this opinion indicates that plaintiff's psychological problems are not so serious as to present a substantial limitation upon his employment. Nor do his intellectual limitations exclude him from substantial gainful employment. We believe substantial evidence supports the ALJ as to these conclusions.

 Plaintiff further argues that the ALJ improperly applied the medical vocational guidelines in this case because non-exertional impairments substantially limited plaintiff's capacity for employment. We believe this argument is largely repetitive. The court has already found that the ALJ correctly decided that plaintiff's non-exertional pain and his mental and intellectual limitations were not so significant as to prevent plaintiff from performing light and sedentary work with no more than occasional bending. Given this foundation, it was permissible for the ALJ to apply the vocational guidelines. See Castellano v. Secretary of Health and Human Services, 26 F.3d 1027, 1030 (10th Cir.1994). The nonexertional impairments were not suffi-

ciently significant to require the testimony of a vocational expert. Cf., *Lucy v. Chater,* 113 F.3d 905 (8th Cir.1997) (claimant's IQ of 78 and morbid obesity were significant nonexertional limitations which precluded sole reliance upon the guidelines).

■ Finally, plaintiff contends that the ALJ should have compared plaintiff's back impairment to the listing set out in section 1.05 of the Listing of Impairments, Appendix 1 to 20 C.F.R. Part 404, Subpart P. Plaintiff asserts that the ALJ simply concluded that this listing was not met without discussing the evidence to support the conclusion. We find the discussion of the ALJ at page 10 of his decision to be adequate. (Tr. 25). There is clear support in the record, which the ALJ discusses, for his conclusion that the evidentiary specifications for the spine impairment at section 1.05 are not present in this case.

In conclusion, upon a review of plaintiff's arguments to reverse the decision to deny benefits, the court has determined that the Commissioner's findings are supported by substantial evidence and adhere to legal standards. The decision to deny benefits is affirmed.

**IT IS SO ORDERED.**