Antonio V. CHAVEZ, Plaintiff,

v.

Jo Anne B. BARNHART,
Commissioner of Social
Security, Defendant.

No. CIV.A.02–2484–GTV.

United States District Court,
D. Kansas.

Jan. 12, 2004.

Teresa M. Meagher, Law Office of Teresa M. Meagher, Leawood, KS, for Plaintiff.

David D. Zimmerman, Office of United States Attorney, Kansas City, KS, for Defendant.

## MEMORANDUM AND ORDER

VanNBEBBER, Senior District Judge.

Plaintiff Antonio Chavez brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) and D. Kan. Rule 83.7, seeking judicial review of the decision of the Commissioner of Social Security ("Commissioner") to deny his applications for a period of disability, disability insurance benefits, and supplemental security income benefits under Titles II and XVI of the Social Security Act. Plaintiff claims that he is impaired due to injuries he suffered from a fireworks explosion and a motor vehicle accident. Specifically, Plaintiff alleges pain in his neck, left arm, chest, back, and in both legs, constant ringing in his ears, and memory loss. The record indicates Plaintiff completed the sixth grade in Mexico and does not speak or understand more than a little English. Plaintiff's past work experience includes traveling to Mexico to buy bridal merchandise and then selling the merchandise to store owners in California.

Plaintiff contends that the Commissioner made the following errors: (1) failed to fully develop the record; (2) failed to properly assess Plaintiff's residual functional capacity ("RFC"); and (3) failed to take into consideration all of Plaintiff's limitations in determining whether Plaintiff could return to his past relevant work. For the following reasons, the Commissioner's decision is reversed and remanded to the administrative law judge for proceedings consistent with this opinion.

### I. Procedural Background

In September 1997, Plaintiff filed applications for disability benefits, claiming disability since May 10, 1997. The applications were denied both initially and upon reconsideration. At Plaintiff's request, an administrative law judge ("ALJ") held a hearing on May 27, 1999, at which Plaintiff and his counsel were present. At that time, Plaintiff amended his alleged disability onset date to June 28, 1997. On September 16, 1999, the ALJ rendered a decision in which he determined that Plaintiff was not under a "disability" as defined by the Social Security Act. After the ALJ's unfavorable decision, Plaintiff requested review by the Appeals Council. The Appeals Council denied Plaintiff's request for review on July 26, 2002, rendering the ALJ's decision the final decision of the Commissioner.[1]

### II. Standard of Review

The Commissioner's findings are binding on this court if supported by substantial evidence. 42 U.S.C. § 405(g); *Dixon v. Heckler*, 811 F.2d 506, 508 (10th Cir.1987). The court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence in the record and whether the Commissioner properly applied relevant legal standards. *Marshall v. Chater*, 75 F.3d 1421, 1425 (10th Cir.1996) (citing *Castella-*

---

1. The court notes that Plaintiff later filed a second application for disability benefits. Plaintiff was found entitled to disability benefits based on a disability that began on February 20, 2000.

*no v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1028 (10th Cir.1994)). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Castellano*, 26 F.3d at 1028 (citations and internal quotation marks omitted). The court may not reweigh the evidence or substitute its judgment for that of the ALJ or the Commissioner. *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1500 (10th Cir.1992).

### III. The ALJ's Findings

1. Claimant met the disability insured status requirements of the Act on June 28, 1997, the date claimant stated he became unable to work, and continues to meet them through the date of this decision.

2. Claimant has not engaged in substantial gainful activity since June 28, 1997.

3. The medical evidence establishes that claimant has neck and left arm pain, a history of right tympanic surgery, and a mild memory impairment, but that he does not have an [impairment] or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4. Claimant's subjective allegations of pain and other symptoms are found not credible for the reasons set forth in the Evaluation section of this decision.

5. Claimant has the residual functional capacity to perform work-related activities with no limitations on his ability to sit, stand, walk, bend or climb. He would be able to lift forty to fifty pounds and push and pull with his right arm, but he would have some limitations with his left arm. He would have no grip limitations. He wears bilateral hearing aides. He has a mild organic mental disorder that causes slight restrictions of activities of daily living, no difficulties in maintaining social functioning, he seldom has deficiencies of concentration, and he never has had episodes of deterioration or decompensation in work or work-like settings (20 C.F.R. §§ 404.1545 and 416.945).

6. Claimant's past relevant work as an importer/exporter, as ordinarily performed in the national economy, did not require the performance of work-related activities precluded by the above limitations (20 C.F.R. §§ 404.1565 and 416.965).

7. Claimant's impairments do not prevent claimant from performing his past relevant work.

8. Claimant was not under a "disability" as defined in the Social Security Act, as amended, at any time through the date of the decision (20 C.F.R. §§ 404.1520(e) and 416.920(e)).

### IV. Discussion

#### A. Failure to Develop the Record

##### 1. Record Concerning Mental Impairments

█ Plaintiff first argues that the ALJ did not fully develop the record concerning his mental impairments. Specifically, Plaintiff argues that the ALJ failed to order a proper neuropsychological evaluation as he promised Plaintiff's counsel at the end of the hearing; instead, Plaintiff underwent a second psychological exam by the same doctor who previously gave Plaintiff a psychological examination.

On October 9, 1998, Dr. Anna Maria Bellatin, a licensed psychologist, administered to Plaintiff a psychological assessment "with particular interest in his cogni-

tive level, his memory, and his mental status." · At this evaluation, Dr. Bellatin conducted a psychological consultation, "the WAIS (Weschsler Adult Intelligence Scale) in Spanish, the Wechsler Memory Scale in Spanish and the Test for Memory Malingering." On July 3, 1999, in response to the ALJ's order for a neuropsychological evaluation, Dr. Bellatin again administered to Plaintiff a psychological assessment "with particular interest in his level of cognitive functioning, his mental status, and his memory." Dr. Bellatin's report indicates "[a] request was made to conduct a psychological consultation and to administer the WAIS (Weschsler Adult Intelligence Scale) in Spanish and the Wechsler Memory Scale in Spanish." Plaintiff argues this evaluation did not properly respond to the ALJ's order for a neuropsychological examination or provide any new information from the initial examination conducted by Dr. Bellatin. The court concludes Plaintiff's argument has merit.

The record indicates that the ALJ ordered a neuropsychological examination based on the recommendation of the medical expert at the hearing. The record also shows that two other medical professionals previously recommended that Plaintiff undergo a neuropsychological evaluation. Dr. Sofia Khan, the medial examiner at the hearing, stated that another doctor had previously diagnosed Plaintiff as suffering from a subdural bleed as a result of a fireworks explosion. Dr. Khan testified "if there was a bleed [sic] that could potentially mean that he had some kind of head injury. Of course this could lead to a mild organic disease as well as memory impairment. Which is not completely, or clearly documented in his charts by neuropsychanalysis." The ALJ then asked Dr. Khan if a neuropsychological evaluation would be recommended and Dr. Khan responded affirmatively, stating "that seems to be a concern."

The court determines that the record is not sufficiently developed in light of Dr. Khan's recommendation and the recommendations from two other doctors that a neuropsychological examination be conducted on Plaintiff. After reviewing all of Plaintiff's medical documentation, which would have included Dr. Bellatin's initial psychological examination, Dr. Khan testified that the degree of mental impairment caused by Plaintiff's subdural bleed was "not completely, or clearly documented in his charts by neuropsychanalysis." The court questions how the record became any clearer after a second examination was conducted by Dr. Bellatin using the same battery of tests.

The court also notes that the record is deficient as to whether Dr. Bellatin was properly trained in the area of neuroscience or whether Dr. Bellatin conducted a proper neuropsych evaluation as detailed in the social security regulations. The applicable regulations provide that:

> Comprehensive neuropsychological examinations may be used to establish the existence and extent of compromise of brain function, particularly in cases involving organic mental disorders. Normally, these examinations include assessment of cerebral dominance, basic sensation and perception, motor speed and coordination, attention and concentration, visual-motor function, memory across verbal and visual modalities, receptive and expressive speech, higher-order linguistic operations, problem-solving, abstraction ability, and general intelligence. In addition, there should be a clinical interview geared toward evaluating pathological features known to occur frequently in neurological disease and trauma, e.g., emotional liability, abnormality of mood, impaired impulse control, passivity and apathy, or inap-

propriate social behavior. The specialist performing the examination may administer one of the commercially available comprehensive neuropsychological batteries, such as the Luria–Nebraska or the Halstead–Reitan, or a battery of tests selected as relevant to the suspected brain dysfunction. The specialist performing the examination must be properly trained in this area of neuroscience.

20 C.F.R. pt. 404, subpt. P, app. 1, §§ 12.00D; 12.00D(8) (2002).

Both of Dr. Bellatin's assessments tested Plaintiff's verbal and visual memory, attention and concentration, and general intelligence. Furthermore, Dr. Bellatin performed a clinical interview on both exams as suggested by the regulations. It is quite possible that Dr. Bellatin performed a neuropsychological evaluation and selected a battery of tests "relevant to the suspected brain dysfunction" of Plaintiff. The Commissioner, however, fails to make any such argument. The Commissioner's brief argues that "[t]he ALJ had adequate evidence to make his determination without the neurospsychological consultation, particularly given there were no neuropsychological consultants available to administer testing in Spanish." The Commissioner further argues that "[t]he ALJ did not abuse his discretion in sending Plaintiff to a second examination with psychologist Dr. Bellatin rather than a neuropsychologist, since Dr. Bellatin spoke Spanish." This argument only supports the conclusion that Dr. Bellatin was not a specialist in neuropsychology and that Plaintiff did not undergo a neuropsychological examination as ordered by the ALJ. Furthermore, the record at the hearing shows that the ALJ ordered a neuropsychological examination if Plaintiff's counsel promised that an interpreter would be present. Thus, the Commissioner's argument that Dr. Bellatin's examination was sufficient because she spoke Spanish and a neuropsychological consultant was not available is unpersuasive.

The court holds that remand is necessary so that the ALJ can send Plaintiff to a proper neuropsychological examination conducted by an individual with specialized training and experience in the field.

*2. Record Concerning Hearing Loss*

█ Plaintiff next argues that the ALJ failed to develop the record concerning his documented hearing loss and that additional testing is necessary "to establish what, if any, deficits of hearing plaintiff experienced and under what circumstances."

Plaintiff's loss of hearing is well documented by the record. On June 27, 1997, Plaintiff's eardrums were injured in a fireworks explosion. Dr. Daniels, an ENT specialist, treated Plaintiff on several occasions and reported that Plaintiff had virtually no hearing in his right ear and his hearing was fairly normal in his left ear. He diagnosed Plaintiff as suffering from a cochlear degeneration and a perforated tympanic membrane. Surgery was performed on October 6, 1998, to repair the perforated right tympanic membrane. An audiogram on March 1, 1999, indicated the perforation was healed and Plaintiff acquired some improvement in his hearing. Plaintiff was later fitted with hearing aids in both of his ears. In addition, Dr. Bellatin's second psychological assessment states that Plaintiff "did not seem to have much difficulty hearing conversational tones with or without hearing aids. When he was without them he asked [me] to repeat a statement during a couple of occasions."

During the hearing before the ALJ, Plaintiff's hearing loss was addressed by testimony from Plaintiff and the attending medical expert, Dr. Kahn. Initially, Plain-

tiff's counsel asked Plaintiff about his hearing problems. Plaintiff stated that he suffered from ringing in his ears almost every day, that he cannot hear out of his right ear without the hearing aid, and that even though he is able to hear with his hearing aids, he gets very tired when he talks because he feels like he has a microphone inside of him. Later in the hearing, Dr. Kahn testified about Plaintiff's medical history concerning his hearing loss. Dr. Kahn noted that Plaintiff had been seen by an ENT specialist, that surgery had been performed on his right ear, and that he wore hearings aids because his hearing impairment did not improve. Finally, Dr. Kahn concluded Plaintiff "must wear a hearing aid and that solves most of his hearing problem."

Plaintiff argues that the ALJ "had an obligation to more fully investigate plaintiff's ability to hear and distinguish sounds and speech," including "hearing tests both with and without his hearing aids." After carefully reviewing the record, the court cannot conclude that the ALJ abused his discretion by failing to order additional hearing tests. *See Diaz v. Sec'y of Health & Human Servs.*, 898 F.2d 774, 778 (10th Cir.1990) (stating that the ALJ has broad latitude in determining whether to order a consultative examination).

First, the record is devoid of any suggestion by the ENT specialist or any other physician that Plaintiff required additional testing on his hearing. In treating Plaintiff for his hearing impairment, Dr. Daniels conducted an audiogram on at least four occasions between March 1998 through March 1999. (Tr. at 165, 221, 224, 231). One of those audiograms did show that Plaintiff had a 40–50dB loss in his right ear, and a 20–30dB loss in his left ear. Another audiogram performed after Plaintiff's surgery on his right ear indicated Plaintiff's hearing had improved a little.

Moreover, Dr. Bellatin's psychological consultation mentioned that Plaintiff appeared to be hearing normally with his hearing aids. During the hearing before the ALJ, Dr. Khan testified that Plaintiff did suffer from ringing in his ears, but also testified that his hearing aids solved most of his hearing problem.

The court also notes that Plaintiff's counsel never identified this issue before the ALJ. In *Hawkins v. Chater*, the Tenth Circuit stated:

> [W]hen the claimant is represented by counsel at the administrative hearing, the ALJ should ordinarily be entitled to rely on the claimant's counsel to structure and present claimant's case in a way that the claimant's claims are adequately explored. Thus, in a counseled case, the ALJ may ordinarily require counsel to identify the issue or issues requiring further development.

113 F.3d 1162, 1167–68 (10th Cir.1997).

At the ALJ hearing, Plaintiff's counsel questioned Plaintiff only briefly concerning his hearing loss. At no time during the hearing did Plaintiff or Plaintiff's counsel ever identify Plaintiff's hearing loss as an issue requiring further development. Furthermore, in Plaintiff's brief, Plaintiff attached a copy of a letter that was submitted to the Appeals Council. This letter cited many reasons why the ALJ's decision should be reversed, including the ALJ's failure to develop the record by not ordering a proper neuropsychological test. The letter, however, never mentioned the need for additional testing on Plaintiff's hearing loss.

The court concludes that given the evidence in the record and Plaintiff's failure to identify this issue as requiring further development, substantial evidence supports the ALJ's decision not to order further testing on Plaintiff's hearing.

### B. The ALJ's Analysis at Step Four

Plaintiff alleges several errors at step four of the ALJ's decision. "The Secretary has established a five-step sequential evaluation process for determining whether a claimant is disabled." *Williams v. Bowen,* 844 F.2d 748, 750 (10th Cir.1988). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Id.* Those five steps are as follows:

(1) A person who is working is not disabled.

(2) A person who does not have an impairment or combination of impairments severe enough to limit the ability to do basic work activities is not disabled.

(3) A person whose impairment meets or equals one of the impairments listed in the regulations is conclusively presumed to be disabled.

(4) A person who is able to perform work [he] has done in the past is not disabled.

(5) A person whose impairment precludes performance of past work is disabled unless the [Commissioner] demonstrates that the person can perform other work. Factors to be considered are age, education, past work experience, and residual functional capacity.

*Reyes v. Bowen,* 845 F.2d 242, 243 (10th Cir.1988) (citing 20 C.F.R. § 416.920(a)-(f)) (internal citations omitted).

██ The ALJ determined that Plaintiff was not disabled at step four, which consists of three phases. "In the first phase, the ALJ must evaluate a claimant's physical and mental [residual functional capacity], and in the second phase, he must determine the physical and mental demands of the claimant's past relevant work." *Winfrey v. Chater,* 92 F.3d 1017, 1023 (10th Cir.1996) (citation omitted).

"In the final phase, the ALJ determines whether the claimant has the ability to meet the job demands in phase two despite the mental and/or physical limitations found in phase one." *Id.* A "claimant bears the burden at step four of proving his inability to return to his particular former job and to his former occupation as that occupation is generally performed throughout the national economy." *Andrade v. Sec'y of Health and Human Servs.,* 985 F.2d 1045, 1051 (10th Cir.1993). "However, in order to make the ultimate finding that a claimant is not disabled at step four, the ALJ is required by SSR 96–8p to make specific and detailed predicate findings" at each of the three phases. *Winters v. Barnhart,* No. 00–2419–DJW, 2002 WL 1286134, **13–14, 2002 U.S. Dist. LEXIS 10333, at *41–42 (D.Kan. June 5, 2002).

The ALJ stated in his decision that: (1) "the combination of claimant's medically determinable impairments is not of such severity to prevent him from performing his past relevant work as an import/exporter as this job is normally performed in the national economy"; and (2) "[c]laimant's impairments do not prevent claimant from performing his past relevant work." *See Andrade,* 985 F.2d at 1051 (stating that "the phrase past relevant work includes a claimant's particular past relevant job, as well as the type of work claimant performed in the past, as that work is generally performed in the national economy"). Plaintiff argues that the ALJ erred in his assessment at phases one and two.

### 1. Phase One: Plaintiff's Residual Functional Capacity Determination

Plaintiff contends that the ALJ inaccurately assessed Plaintiff's residual functional capacity at the first phase of step

four. The ALJ specifically found that Plaintiff retains the residual capacity to: perform work-related activities with no limitations on his ability to sit, stand, walk, bend or climb. He would be able to lift forty to fifty pounds and push and pull with his right arm, but he would have some limitations with his left arm. He would have no grip limitations. He wears bilateral hearing aides. He has a mild organic mental disorder that causes slight restrictions of activities of daily living, no difficulties in maintaining social functioning, he seldom has deficiencies of concentration, and he never has had episodes of deterioration or decompensation in work or work-like settings. Plaintiff maintains that the ALJ did not properly account for: (1) his limited ability to communicate in English; (2) the loss of hearing during the time before Plaintiff was fitted with hearing aids; (3) the constant ringing in his ears; and (4) his mental abilities. Plaintiff also argues the ALJ erred in his assessment of Plaintiff's credibility and his determination that Plaintiff was capable of lifting forty to fifty pounds with his right arm.

■ Plaintiff first argues that the ALJ's determination of his residual functional capacity was inadequate because it did not account for Plaintiff's limited ability to communicate in English. Plaintiff contends that "the ALJ did not include plaintiff's language barrier in his RFC findings and specifically directed the medical advisor and the vocational expert not to consider plaintiff's inability to speak English." Plaintiff claims his inability to communicate in English would not affect his ability to perform his former job as he performed it, but as it was generally performed in the national economy.

Other courts have analyzed the ALJ's failure to consider a claimant's inability to speak and understand English at step four of the Commissioner's analysis. In *Garcia v. Secretary of Health and Human Services*, the plaintiff argued that "the Secretary's refusal, at step four of the sequential analysis, to consider a claimant's inability to speak English [was] inconsistent with the language of the Act." 46 F.3d 552, 555 (6th Cir.1995). The court held that "Congress clearly intended the Secretary to consider education when determining whether the claimant can perform other substantial gainful work which exists in the national economy, but not when considering the claimant's ability to do his previous work." "Congress intended a claimant's ability to perform previous work to be assessed apart from the considerations of age, education, and work experience." *Id.* at 556. Thus, the ability to speak English is not a factor the ALJ must consider at the fourth step, but is a factor that must be considered at the fifth step. *See Ordonez v. Massanari*, No. C00–4145–DEO, 2001 WL 34008720, *15, 2001 U.S. Dist. LEXIS 24634, at *42 (N.D.Iowa Sept.13, 2001) ( "The ALJ only has to consider a claimant's limited ability to speak and understand English if the ALJ determines [at step four] that the claimant can not perform previous relevant work.").

More recently, the Ninth Circuit declined to reach a definite conclusion on this issue. In *Pinto v. Massanari*, the court noted:

It is unclear whether the ALJ should have considered [claimaint's] language skills at all at step four, given that [claimant's] difficulties with language are independent of the disability upon which she bases her claim. We decline to reach the question of whether illiteracy may properly be considered at step four of a disability determination. The

regulations point in contradictory directions on this question.[2]

249 F.3d 840, 847 n. 5 (9th Cir.2001).

The court concludes that the ALJ did not commit reversible error by not accounting for Plaintiff's inability to communicate in English at step four. Although the court notes that a more realistic assessment of Plaintiff's residual functional capacity might incorporate Plaintiff's language barrier into the ALJ's RFC assessment, the court is persuaded by the Sixth Circuit's ruling in *Garcia* on this issue. *See also Martinez v. Bowen,* 685 F.Supp. 70, 71 n. 2 (S.D.N.Y.1988) (stating "that however logically relevant [the ability to speak English] might have been to the threshold determination of whether a claimant can do his past work, it is foreclosed by the applicable statutory scheme").

■ Second, Plaintiff argues that the ALJ did not properly consider Plaintiff's hearing loss in determining Plaintiff's residual functional capacity. In particular, Plaintiff argues that his residual functional capacity did not reflect the period of time before he was fitted with hearing aids.

■ " 'If an impairment can reasonably be treated or controlled it cannot constitute a disability.' " *King v. Apfel,* No. 00–

4104–RDR, 2001 WL 1568350, *6, 2001 U.S. Dist. LEXIS 20467, at*17 (D.Kan. Nov. 30, 2001) (noting the claimant "could listen and communicate effectively in favorable listening environments" with hearing aids) (citations omitted). As already discussed, the medical records and Plaintiff's testimony at the hearing indicate that Plaintiff could hear normal conversational tones with hearing aids. The record shows that Plaintiff's loss of hearing was controlled and that the ALJ did not ignore Plaintiff's need to wear hearing aids in determining his RFC. Accordingly, the fact that Plaintiff was not fitted with hearing aids until March or April of 1999 does not invalidate the ALJ's residual functional capacity determination.

■ Third, the Plaintiff contends that the ALJ did not consider Plaintiff's complaints of constant ringing in his ears when determining his residual functional capacity. The ALJ's decision did acknowledge that Plaintiff complained of constant ringing in his ears and that the medical expert testified Plaintiff suffered from this impairment. The medical evidence also indicates Plaintiff suffers from a cochlea degeneration, which can cause ringing in the ear. Thus, substantial evidence supports

---

**2.** The Ninth Circuit cited several regulations in its opinion:

Compare SSR 96–8P ("Work related mental activities generally required by competitive, remunerative work include the abilities to: understand [and] carry out ... instructions; ...; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting") and § 404.1564(b)(5) and 416.964(b)(5) ("Because English is the dominant language of the country, it may be difficult for someone who doesn't speak and understand English to do a job, regardless of the amount of education the person may have in another language") and SSR 82–61 ("Congress has ... expressed the intent

that disability determination be carried out in as realistic a manner as possible") with 20 C.F.R. §§ 416.960(c) and 404.1560(c) (stating that education will not normally be considered until step five of a disability proceeding) and 20 C.F.R. [§§ ] 404.1464(b) and 416.964(b) ("The term 'education' also includes how well you are able to communicate in English since this ability is often acquired or improved by education."). *See also* 20 C.F.R. [§§ ] 404.1564(b)(5) and 416.964(b)(5) ("Since the ability to speak, read and understand English is generally learned or increased at school we may consider this an educational factor.").

249 F.3d at 847 n. 5.

Plaintiff's allegations of constant ringing in his ears.

The court notes, however, that the record is unclear whether Plaintiff's hearing aids have solved the ringing in his ears. The court remands this issue to the ALJ to determine if Plaintiff's hearing aids have resolved this problem or if this condition should be analyzed in determining Plaintiff's residual functional capacity.

 Fourth, Plaintiff argues that the ALJ did not accurately assess Plaintiff's mental abilities in determining his residual functional capacity. The ALJ determined that Plaintiff "has a mild organic mental disorder that causes slight restrictions of activities of daily living" and "he seldom has deficiencies of concentration." Plaintiff argues that the ALJ's RFC findings did not include information from a chart prepared by Dr. Bellatin. Dr. Bellatin's form assessed Plaintiff's ability to deal with work stresses, his ability to maintain concentration and attention, and his ability to carry out more than simple job instructions as "fair."

 "The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence." *Clifton v. Chater*, 79 F.3d 1007, 1009–10 (10th Cir. 1996) (citing *Vincent ex rel. Vincent v. Heckler*, 739 F.2d 1393, 1394–95 (9th Cir. 1984)). The ALJ relied on the testimony of the medical expert at the hearing to determine that Plaintiff had "slight" restrictions in his daily living activities and that Plaintiff "seldom has deficiencies in his concentration." The court concludes that the ALJ did not commit a reversible error simply because the ALJ did not discuss Dr. Bellatin's chart indicating Plaintiff's mental abilities in those areas were "fair." The ALJ, however, is instructed on remand to consider the information obtained from the neuropsychological test, in addition to reviewing all of the medical evidence presently in the record concerning Plaintiff's mental impairments. The ALJ should demonstrate that he considered all the evidence by making specific findings on how Plaintiff's residual functional capacity was determined with respect to Plaintiff's mental impairments.

 Fifth, Plaintiff challenges the ALJ's determination that his complaints of severe physical and memory problems were exaggerated. " 'Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence.' " *McGoffin v. Barnhart*, 288 F.3d 1248, 1254 (10th Cir.2002) (quoting *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir.1995)). "Nonetheless, 'findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings.' " *Id.* (citing *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir.1988)).

The medical reports from treating physicians do not provide a definite answer to this issue. For example, Dr. Kaspar, who performed a psychological evaluation on Plaintiff, stated:

> There is some possibility that Mr. Chavez may be exaggerating or feigning some of his difficulties owing to a clear absence of current financial and medical resources. Additionally, of course, there is the possibility that Mr. Chavez may be beginning to show signs of memory deterioration secondary to a dementia-like early arteriorvascular or other slowly progressing brain disease.

Furthermore, Dr. Bellatin noted in her last assessment of Plaintiff that his "difference in functioning may be attributed to some decline in memory ability or it may be attributed to lack of effort and motivation to perform well during this last test-

ing." The ALJ also based part of his credibility determination on non-medical evidence. The ALJ cited Plaintiff's inability to document his earnings and his "sporadic" work history as factors weighing against Plaintiff's credibility. Based on the present record, the court will not usurp the ALJ's determination of Plaintiff's credibility. The court, however, concludes that it will be necessary for the ALJ to review the evidence concerning Plaintiff's credibility in light of any new information obtained from the neuropsychological report. The ALJ should then make specific findings to support his determination of Plaintiff's credibility.

■■■ Finally, Plaintiff challenges the ALJ's determination that Plaintiff could lift forty to fifty pounds with his right arm. The ALJ's finding appears to be based on the testimony of Dr. Khan, the non-treating medical expert that testified during the hearing. Dr. Khan's testimony does not provide a rationale for her conclusion. Furthermore, the ALJ's decision does provide any additional basis to support this finding. *See Winfrey v. Chater,* 92 F.3d 1017, 1025 (10th Cir.1996) ("When, as here, the ALJ makes findings only about the claimant's limitations, and the remainder of the step four assessment takes place in the VE's head, we are left with nothing to review."). The court remands this issue for the ALJ to make specific findings on Plaintiff's ability to lift weight with his right arm.

### 2. Phase Two: Demands of Plaintiff's Past Relevant Work

Plaintiff contends that the ALJ erred at step four, phase two, of the evaluation process. At the second phase, the ALJ "must determine the physical and mental demands of the claimant's past relevant work." *Winfrey,* 92 F.3d at 1023. The Plaintiff argues: (1) that the ALJ mischar-

acterized Plaintiff's job duties as an importer/exporter; and (2) that the ALJ failed to make an inquiry into the mental demands of Plaintiff's work. In response, the Commissioner states: (1) that the classification of "importer/exporter" is the "type" of past relevant work Plaintiff previously performed; and (2) that the ALJ asked the vocational expert a hypothetical question that properly accounted for all of Plaintiff's credible allegations.

■■■ Plaintiff first claims the ALJ mischaracterized his job duties as an importer/exporter. The transcript of the hearing shows that Plaintiff's past work has consisted of going on trips to Mexico to buy bridal-type merchandise and then returning to California to sell the merchandise to stores in California. Plaintiff testified that he was self-employed and that in the normal course of his work he would lift boxes of merchandise that weighed between 80 to 110 pounds. The vocational expert ("VE") testified that the title of Plaintiff's job, "as close as that could get to," was an importer/exporter. The VE stated that after hearing Plaintiff's description of his work, the exertional level of his job would be medium to heavy. The VE then testified that an importer/exporter, as normally performed in the national economy, "probably wouldn't be doing much lifting at all." Because an importer/exporter would be doing most of the work by phone and utilizing delivery services, the VE classified an importer/exporter's exertional level as normally performed in the national economy as sedentary. The ALJ and VE then noted the differences between Plaintiff's work as he performed it and the job description of an importer/exporter when normally performed in the national economy:

ALJ: But, if he had to do a lot of traveling as, he said he did, to go to Mexico his job would have been some-

what unique then and somewhat different then [sic] the way it would normally be performed, I guess.

VE: Probably, yes, sir.... This is a difficult one because I don't have a lot of information about his job. It appeared that he was a kind of delivery person because he'd go to Mexico and pick these things up and—

ALJ: Bring them back.

VE:—deliver them to different stores.

ALJ: So it was kind of importer, exporter, delivery man.

VE: Yes.

ALJ: As an integral part of the job as he performed it.

VE: Yes, sir.

The ALJ then presented the VE with a hypothetical of Plaintiff's medical impairments. The VE concluded that based on the hypothetical, Plaintiff could not return to his past work as Plaintiff described it because of the delivery component that required lifting heavy boxes. The VE, however, stated Plaintiff could return to his work as it normally is performed in the national economy. Relying on the VE's testimony, the ALJ's decision concluded that "the combination of claimant's medically determinable impairments is not of such severity to prevent him from performing his past relevant work as an importer/exporter as this job is normally performed in the national economy."

The court is not convinced that the ALJ properly characterized Plaintiff's job as an importer/exporter or that Plaintiff can execute that job as normally performed in the national economy. The Commissioner argues that the ALJ properly characterized Plaintiff's "type" of work. It appears from the record, however, that the VE did not have enough information to properly characterize Plaintiff's title as "importer/exporter." The ALJ and VE agreed that

Plaintiff's work was "unique" and "somewhat different then [sic] the way it would normally be performed." In fact, the record reflects that an "integral" part of Plaintiff's job consisted of delivering his merchandise. The VE stated that an importer/exporter generally works from the phone and hires others to perform the delivery services. The VE, however, did not provide any other details on how the job of importer/exporter would be performed in the national economy or consider whether Plaintiff possessed the skills or capabilities necessary to perform this job as it is generally performed.

Also during the hearing, the VE and ALJ discussed Plaintiff's transferable skills, and the VE stated Plaintiff's job would have required him to negotiate an invoice, price products, establish accounts, and maintain sales records. The court notes, however, that neither the ALJ nor VE investigated the skills actually acquired by Plaintiff. *See Dikeman v. Halter*, 245 F.3d 1182, 1185 (10th Cir.2001) (" 'Neither an occupational title by itself nor a skeleton description [of a job] is sufficient to document the claimant's acquisition of skills. Job titles, in themselves, are not determinative of skill level.' ") (citations omitted).

The court concludes that based on the record, Plaintiff's duties from his past relevant work were sufficiently distinct from the duties of an importer/exporter as normally performed in the national economy. The VE's testimony did not constitute substantial evidence that Plaintiff could perform his past relevant work as it is generally performed in the national economy. *See Andrade*, 985 F.2d at 1051–52 (citing *Villa v. Heckler*, 797 F.2d 794, 798 (9th Cir.1986)) (stating that to overcome the presumption that the ALJ correctly categorized a claimant's job in the Dictionary of Occupation Titles, a claimant must show

that the requirements of his prior work were "sufficiently distinct" from the duties described in the Dictionary). On remand, the ALJ is instructed to make more specific findings regarding the duties and skills involved in Plaintiff's past work. The ALJ should also develop a detailed record on the skills required of an importer/exporter as that job is normally performed in the national economy. Finally, based on those findings, the ALJ should evaluate whether Plaintiff can perform that type of work.

Plaintiff also asserts that the ALJ did not make an inquiry into the mental demands of Plaintiff's work as he performed it or as it is normally performed in the national economy. The Commissioner responds by arguing that "the ALJ relied a great deal on the vocational expert for his finding that Plaintiff could return to past relevant work, by asking a hypothetical question." "Thus, the issue is actually whether the ALJ asked the vocational expert a hypothetical question that properly accounted for all of Plaintiff's credible allegations."

In response to the Commissioner's argument, the court notes that the ALJ should not be upheld for relying "a great deal on the vocational expert for his finding." In *Winfrey v. Chater*, the court stated that the "practice of delegating to a VE many of the ALJ's fact finding responsibilities as step four appears to be of increasing prevalence and is to be discouraged." 92 F.3d at 1025. "[W]hile the ALJ may rely on information supplied by the VE at step four, the ALJ himself must make the required findings on the record, including his own evaluation of the claimant's ability to perform past relevant work." *Id.*

The court agrees with Plaintiff that the ALJ did not evaluate the mental demands of Plaintiff's past work or the work as it might normally be performed in the national economy. The court also notes that

Plaintiff's mental ability to perform his past relevant work would nevertheless need to be reevaluated in light of any information gained through the neuropsychological testing. On remand, the court instructs the ALJ to develop the record and make the required findings concerning the mental demands of Plaintiff's past relevant work.

## V. Conclusion

The Commissioner asserts that even if the court determines that the ALJ's step four analysis is unsupported by substantial evidence, remand would be unnecessary. The Commissioner points out that testimony from the vocational expert, based on Plaintiff's residual functional capacity, states that Plaintiff could perform other work found in significant numbers in the national economy. The court rejects this argument. Even though the ALJ continued on to step five during the hearing, the ALJ denied benefits at step four. Thus, the ALJ did not reach step five of the analysis in his decision. Also, affirming the ALJ's decision would be inappropriate considering the court has already concluded that the ALJ committed several errors in reaching his decision.

IT IS, THEREFORE, BY THE COURT ORDERED that the decision of the Commissioner denying Plaintiff benefits is reversed and remanded to the administrative law judge for further proceedings consistent with this opinion. Specifically, the court makes the following rulings: (1) the ALJ failed to properly develop the record by not obtaining a proper neuropsychological examination; (2) substantial evidence supports the ALJ's decision not to order additional hearing tests; (3) the ALJ properly refused to consider Plaintiff's language barrier at step four of his analysis; (4) the ALJ's residual functional capacity determination properly

considered Plaintiff's hearing loss; (5) the ALJ should determine if Plaintiff's hearing aids resolved his complaints of constant ringing in his ears; (6) the ALJ should reevaluate Plaintiff's credibility and mental impairments at step four in light of the new information obtained from the neuropsychological testing; (7) the ALJ should make specific findings regarding Plaintiff's ability to lift weight with his right arm; (8) substantial evidence did not support the ALJ's decision that Plaintiff's job should be labeled as an importer/exporter and that Plaintiff could perform that type of work as generally performed in the national economy; and (9) the ALJ should evaluate the mental demands of Plaintiff's past relevant work.

Copies of this order shall be transmitted to counsel of record.

The case is closed.

**IT IS SO ORDERED.**