**Herbert W. SIEGLE, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.**

**No. CIV.A. 04–WM–588.**

United States District Court, D. Colorado.

Feb. 7, 2005.

Chrisilda R. Noel, Boulder, CO, for plaintiff.

Debra J. Meachum, Social Security Administration-Co Office of General Counsel Office of General Counsel, Denver, CO, Michele M. Kelley, Social Security Administration-Co Office of General Counsel Office of General Counsel, Denver, CO, for defendant.

## MEMORANDUM OPINION AND ORDER

MILLER, District Judge.

Plaintiff Herbert W. Siegle (Siegle) appeals the final decision of Jo Anne B. Barnhart, Commissioner of Social Security (Commissioner), denying his application for disability insurance benefits and supplemental security income. Following review of the administrative record, the par-

ties' written and oral arguments, and their tendered draft orders, I conclude that the Commissioner's decision should be reversed.

### Background

Siegle was born October 13, 1954. Administrative Record (Record) at 266. He graduated from high school, and has been employed as a bus driver, ramp agent, apartment manager and small products assembler. *Id.* at 266–68. Siegle alleges that he is disabled due to a bulged disc, headaches and pain in his arms, hands, legs, and neck, resulting from a vehicular accident on March 23, 2001. *Id.* at 51, 72, 114–15.

### A. *Treatment History*

The Record reveals the following relevant medical history. On March 23, 2001, Siegle went to the emergency room (ER) after being involved in an accident, complaining of mild pain in his posterior neck and lower back. *Id.* at 114. Findings on exam were unremarkable, and the doctor diagnosed cervical and lumbar strain and discharged Siegle the same day in good condition. *Id.* at 115.

On June 5, 2001, Siegle presented to Kaiser Permanente (Kaiser), his regular healthcare provider, complaining of sleep disturbance and generalized body pains since his accident. *Id.* at 195. He was seen by Karen Sloan, M.D., who prescribed amitriptyline without an examination. *Id.* at 197.

On June 26, 2001, Siegle returned to Kaiser and saw Jonathan Gordon, M.D., complaining of neck pain, nausea, chronic headaches, and pain, numbness and weakness in both hands. *Id.* at 202. Dr. Gordon found decreased range of motion, flexion, and extension in Siegle's neck, as well as mild trapezius tenderness. *Id.* at 203. Dr. Gordon diagnosed Siegle with a whiplash injury to his neck, nausea, and tension headaches, and prescribed zantac and ranitidine. *Id.* Siegel saw Dr. Gordon again on July 11, 2001, complaining of headaches, neck pain, and numbness in his hands. *Id.* at 205. Dr. Gordon found some neck tenderness and some decrease in range of motion in his neck and a weakened grip, and continued his diagnosis of whiplash injury to neck. *Id.* On March 1, 2002, at a follow-up appointment, Dr. Gordon, without making additional objective findings, diagnosed cervical radiculopathy and degenerative joint disease, and referred Siegle to David Mulica, a psychiatrist.

Siegle saw Dr. Mulica on March 18, 2002. *Id.* at 215. *Id.* Dr. Mulica found a full range of motion in cervical spine, full strength in upper and lower muscle groups, and that cervical loading and Spurling maneuvers reproduced symptoms. *Id.* at 216. Dr. Mulica diagnosed Siegle with chronic pain syndrome, prescribed nortriptyline, and recommended shoulder and neck strengthening exercises, home traction, and physical therapy. *Id.* at 216–17.[1]

On February 22, 2003, Siegle underwent a MRI examination. The interpreting doctor found that there was a moderate diffuse disk and/or bony bulge at one of his spinal joints, resulting "in bilateral foraminal narrowing, compression of the subarachnoid space anterior to the cord, and mild flattening of the anterior cord contour." *Id.* at 142.

On February 26, and March 5, 2003, Siegle saw Kirsten Fischer, a physical therapist. *Id.* at 147–48. In her notes, Fischer stated that they "discussed glove pattern as not consistent with radicular

---

1. Approximately one year later, on March 24, 2003, Dr. Siegle filled out a loan discharge form for Siegle, in which he opined that Siegle was permanently disabled based on his cervical intervertebral disc disorder. *Id.* at 221.

pain." *Id.* at 149. She also noted that physical therapy had worsened his symptoms. *Id.* at 148.

On March 24, 2003, Siegle had a neurosurgery referral with Edward Colapinto, M.D. *Id.* at 147. Although no assessment is described in the record, Dr. Colapinto diagnosed cervical spondylosis without myelopathy.[2] *Id.*

B. *Consultive History*

On July 31, 2002, Siegle saw Michael Finch, M.D. for a consultive examination. *Id.* at 129. Finch made objective findings including some range of motion limitations, mostly normal strength, and some reflex limitations, and gave a diagnosis of "chronic neck." *Id.* at 130–31. He found inconsistent the fact that Siegle had "very dramatic pain behavior with frequent verbalization of pain with any activity, but is generally smiling," and thus opined that a psychiatric evaluation might be warranted to explore "symptom magnification." *Id.* at 130. Dr. Finch opined that Siegle could lift 15 pounds frequently, 25 pounds on occasion below shoulder height; carry 20 pounds chest high for short distances, sit, stand, and walk four-to six hours a day with frequent position changes, and that his feeling, fingering, and dexterity were normal. Dr. Finch also handwrote on the report that Siegle "was observed in restroom doing [normal range of motion.]" *Id.* at 132.

On August 12, 2002, Siegle saw John Schaeffer, M.D. for a consultive psychological examination. When asked about his current pain level, Siegle described it as a ten out of ten, or "so extreme that he could not move part of his body," even though, as Dr. Schaeffer observed, he was moving "all parts of his body without difficulty during the examination." *Id.* at 135. Dr. Schaeffer found Siegle's thought processes confused and disorganized and his speech rambling and tangential. *Id.* at 136. Dr. Schaeffer diagnosed Siegle with, among other things, a mood disorder due to chronic pain, a pain disorder due to both psychological factors and a general medical condition; a learning disorder; and possible borderline intellectual functioning. *Id.* at 137. Additionally, Dr. Schaeffer opined that Siegle appeared to be "limited somewhat in understanding, memory, ability to sustain concentration, persistence and pace, and social interaction and adaption," but that Siegle might have been over-reporting his limitations. *Id.* at 138.

B. *Administrative Proceedings*

Siegle filed an application for disability insurance benefits on May 23, 2002. After his application was denied, Siegle requested a hearing, which was held on June 26, 2003. Siegle, who was represented by counsel, testified as follows.

After describing his job history, including a job as a small parts assembler Siegle testified that he has constant severe pain in his neck, back, arms, and hands. *Id.* at 277. Pain medications do not help, so for relief, he alternates between standing and sitting all day, as well as pacing up and down his driveway. *Id.* at 270. His pain impairs his ability to concentrate. *Id.* at 272.

Regarding his limitations and daily activities, he testified lifting 25 pounds would create a strain. *Id.* at 271. He can feed himself meals prepared by his wife, and, with difficulty, dress himself and comb his hair. *Id.* at 272, 274. He is not able to reach above his head and he constantly

---

**2.** Cervical spondylosis is "a disorder caused by abnormal wear on the cartilage and bones of the neck (cervical vertebrae) with degeneration and mineral deposits in the cushions between the vertebrae." National Library of Medicine, Medline Plus, *at* http://www.nlm.nih.gov/medlineplus/ency/article/000436.htm (Apr. 28, 2004).

drops items because of the tingling and numbness in his fingers. *Id.* at 273, 282. He is unable to do household chores, and rarely visits friends or his brother. *Id.* at 279. He spends some of his typical day watching TV and laying on the couch, but only for short spells because of his pain. His pain interferes with his sleep.

Siegle testified that he has a life-long learning disability with reading, and was in special education in high school. *Id.* at 279.

Next, a Vocational Expert (VE) testified that Siegle's prior job as assembling medical probes qualified as an assembler of small products under the Dictionary of Occupational Titles. *Id.* at 288. Such an assembler job would require occasionally lifting 20 pounds, at least four hours standing, although many employers allowed alternating sitting and standing. *Id.* at 290. Such jobs generally do not require any reaching above the shoulder, and that they entail only short and simple instructions. *Id.* On cross-examination, the VE testified that if Siegle's testimony were fully credited, he might not be able to perform the job. *Id.* at 292.

### D. *Secretary's Decision*

On July 19, 2003, the ALJ issued his decision, making the following relevant findings: (1) Siegle suffered from degenerative changes of the cervical spine, chronic low back pain, a mood disorder, pain disorder, and learning disorder, all of which were severe disabilities but which did not meet or medically equal one of the listed impairments under the regulations; (2) Siegle was not fully credible; (3) Siegle had the Residual Functional Capacity (RFC) to lift twenty-five pounds occasionally and fifteen pounds frequently; carry twenty pounds; sit, stand, and walk four-to-six hours out of an eight hour day; occasionally climb, stoop, kneel, balance, crouch, and crawl; work only below shoulder level; understand, remember and carry out only short and simple instructions; and tolerate only occasional contact with others; (4) Siegle's' past work as assembler, as generally performed in the national economy, did not require lifting and carrying more than twenty pounds; (5) Siegle's impairments did not prevent him from performing his past relevant work as an assembler; and (6) Siegle was not disabled at any time through the date of the decision. *Id.* at 27.

While the matter was before the Appeals Council, Siegle's attorney asked Dr. Schaeffer to re-assess his diagnosis of possible borderline intellectual functioning on the basis of school records she provided. *Id.* at 255. Dr. Schaeffer found the records unhelpful, and noted that he had suspected Siegle was overstating his limitations; however, based on Siegle's difficulties with reading, written expression, abstract thought, and simple mathematics, Dr. Schaeffer opined that an IQ test was warranted. *Id.* at 256.

On January 30, 2004, the Appeals Council denied Siegle's request for review of the ALJ's decision, rendering the denial of benefits final. *Id.* at 5. In doing so, it found that an IQ test was not warranted as there was no evidence that Siegle's mental status prevents him from performing his past work. *Id.* at 6. On March 25, 2004, Siegle timely initiated this appeal.

### Standard of Review

I review the Commissioner's decision to determine whether her factual findings are supported by substantial evidence in the record as a whole and whether she applied the correct legal standards. *Castellano v. Sec'y of Health and Human Servs.,* 26 F.3d 1027, 1028 (10th Cir.1994). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citations

omitted). The failure to apply correct legal standards or to provide an adequate basis from which I may determine that the appropriate legal principles were followed is grounds for reversal. *Nielson v. Sullivan*, 992 F.2d 1118, 1119–1120 (10th Cir. 1993) (citation omitted).

### Discussion

The Secretary has established a five-step evaluation process to determine whether a claimant is disabled for purposes of the Social Security Act. *See Williams v. Bowen*, 844 F.2d 748, 750–52 (10th Cir.1988). The steps of the evaluation are:

(1) whether the claimant is currently working; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets an impairment listed in appendix 1 of the relevant regulation; (4) whether the impairment precludes the claimant from doing [her] past relevant work; and (5) whether the impairment precludes the claimant from doing any work.

*Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir.1992). Here, the ALJ denied benefits at step four, finding that Siegle could perform his prior job as an assembler.

Siegle raises four general objections to the Commissioner's decision: (1) the ALJ's did not properly assess treating physician evidence; (2) the ALJ's RFC determination was not supported by substantial evidence, including that the record was not properly developed; (3) the ALJ failed to properly assess whether he could return to his assembler job; and (4) the ALJ's credibility finding was erroneous.[3] I will discuss each in turn.

### 1. Physicians' Opinions

■ Siegle argues that the ALJ erred by rejecting the opinions given by his treating physicians, particularly that of Dr. Mulica, given in a loan discharge form, that Siegle was permanently disabled by cervical intervertebral disc disorder.[4] Siegle identifies Dr. Mulica as a treating physician.

■ An ALJ must give controlling weight to a well-supported treating physician's opinion about the nature and severity of a claimant's impairments, if it is not inconsistent with other substantial evidence in the record. *Bean v. Chater*, 77 F.3d 1210, 1214 (10th Cir.1995). Other physician's opinions are not entitled controlling weight; nor must an ALJ explain why such opinions are not controlling. *Doyal v. Barnhart*, 331 F.3d 758, 763–64 (10th Cir.2003) ("[a] physician's opinion is ...not entitled to controlling weight on the basis of a fleeting relationship, or merely because the claimant designates the physician as her treating source"). *See also Reid v. Chater*, 71 F.3d 372, 374 (10th Cir.1995) (the opinion of an examining physician who only saw the claimant once is not entitled to the sort of deferential treatment accorded to a treating physician's opinion). Under the regulations, the de-

---

**3.** In support of his arguments, Siegle attached additional evidence to his opening and reply briefs. However, at oral argument, counsel conceded that such evidence was not properly before me, and withdrew it.

**4.** Siegle also refers to Dr. Gordon, a Kaiser physician who saw Siegle three times for relevant complaints. Record, at 202, 205, and 213. The ALJ's decision does not mention Siegle's appointments with Dr. Gordon. Additionally, Siegle refers to a diagnosis from Dr. Colapinto, a neurosurgeon, who diagnosed him with cervical spondylosis, although the record of Siegle's appointment with Dr. Colapinto provides no discussion. *Id.* at 147. The ALJ did not mention Dr. Colapinto's opinion either. Nonetheless, Siegle identifies no particular opinion from these physicians that he feels is entitled controlling weight.

termination of whether a doctor qualifies as a treating physician is based on:

the "[l]ength of the treatment relationship and the frequency of examination," and the "[n]ature and extent of the treatment relationship." 20 C.F.R. § 416.927(d)(2)(i), (ii). A physician's opinion is deemed entitled to special weight as that of a "treating source" when he has seen the claimant "a number of times and long enough to have obtained a longitudinal picture of [the claimant's] impairment," taking into consideration "the treatment the source has provided" and "the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories." *Id.*

*Doyal,* 331 F.3d at 763.

According to the record, Dr. Mulica saw Siegle once. Although Siegle argues that Dr. Mulica was "a treating physician under the auspices of Dr. Gordon's referral," he provides no authority for his contention, nor is it consistent with the purpose and language of the regulations. Consequently, Dr. Mulica's opinion was not entitled controlling weight.

■■■ However, the ALJ was still required to consider Dr. Mulica's opinion with regards to several factors, and to provide specific, legitimate reasons for rejecting it. *Id.* at 764(*citing* 20 C.F.R. § 416.927(d)(1)-(6)).[5] Here, the ALJ gave specific reasons for rejecting Dr. Mulica's opinion. Among other reasons,[6] the ALJ

noted that "Dr. Mulica's conclusions are not consistent with the rest of the medical record." Record at 25. Consistency of a physician's opinion with the rest of the record is a legitimate factor for the ALJ to consider. *Drapeau,* 255 F.3d at 1213. The opinions of Drs. Finch and Schaeffer indicate that (1) Siegle was overstating his limitations, and (2) that his limitations were inconsistent with a finding that he was totally disabled. These findings provide substantial evidence supporting the ALJ's decision, and, even if there is conflicting evidence, it is not my role to reweigh the evidence. *See Hamilton v. Sec'y of Health & Human Servs.,* 961 F.2d 1495, 1498 (10th Cir.1992).

■■■ The ALJ also noted that the conclusion of whether a claimant is disabled is reserved to the Commissioner. *See Castellano,* 26 F.3d at 1029 (even a treating physician's opinion that a claimant is disabled is not dispositive because the "final responsibility for determining the ultimate issue of disability is reserved to the [Commissioner]"). Further, as the Tenth Circuit has noted in an unpublished opinion, conclusory statements by physicians that a claimant is disabled are fundamentally unhelpful because they have uncertain medical meaning, and because they extend beyond the expertise of a physician. *See Balthrop v. Barnhart,* No. 04–7008, 2004 WL 2677697, at *2 (10th Cir. Nov.24, 2004) (unpublished table decision). In fact, in *Balthrop,* the court held that such a state-

---

**5.** Those factors are: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's atten-

tion which tend to support or contradict the opinion. *Drapeau v. Massanari,* 255 F.3d 1211, 1213 (10th Cir.2001).

**6.** I do note that, although one of the ALJ's reasons for rejecting Dr. Mulica's opinion was the absence of objective findings, this was error, because the record contains notes containing both subjective and objective findings from Siegle's March 18, 2002 appointment with Dr. Mulica. *Id.* at 215–217.

ment is not even a medical opinion, and thus is not subject to objections that it was improperly rejected by the ALJ. *Id.* Consequently, I find that the ALJ did not err by rejecting Dr. Mulica's opinion.

### 2. The ALJ's RFC Determination

■ Siegle argues that the ALJ's RFC determination is not based on substantial evidence because it does not properly account for treating physician evidence. First, the ALJ's RFC may not be challenged because it conflicts with Dr. Mulica's opinion, because, as discussed above, his opinion was properly rejected. Siegle also argues that the ALJ did not discuss why Siegle's MRI results do not support his claim. I disagree that this was error. The MRI results, although indicating that Siegle suffered from a "moderate diffuse disk and/or bony bulge" in his spine, do not by themselves indicate that Siegle was disabled or what his limitations were. Nonetheless, as discussed below in Section 4, I do find that the ALJ's decision does not demonstrate that, in the context of analyzing Siegle's complaints of disabling pain, he adequately considered all of the record medical evidence.

■ Next, Siegle argues that the Commissioner failed to develop the record by ordering an IQ test because he might meet Listing 12.05C (Mental Retardation), which provides for disability on the basis of "a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." The ALJ explicitly found that "there are no objective measures of the claimant's intellectual function which satisfy listing 12.05." Record, at 23. On appeal, Siegle tendered elementary school records indicating, among other things, that he had an I.Q. of 74, although that was "almost certainly below his true potential." *Id.* at 244–45. The Appeals

Council rejected his request for new IQ testing, finding there was "no evidence to indicate any worsening of [Siegle's] cognitive functioning over the years, or that [his] mental status prevents [him] from performing...past work." Record at 6.

The Appeals Council's reasoning must be rejected, however, because Listing 12.05C contemplates the combination of a lower IQ with additional work-related limitation of function. Siegle asserts that his additional functional limitations occurred after he no longer worked as an assembler, and so his status under 12.05C may well have changed. *See also Ambers v. Heckler,* 736 F.2d 1467, 1469–70 (11th Cir.1984) (a mentally retarded claimant who was gainfully employed in the past is disabled upon the cessation of employment).

■ Consequently, I must determine whether the Commissioner, by failing to order an IQ test, fulfilled her "basic obligation to ensure that an adequate record is developed during the disability hearing consistent with the issues raised." *Henrie v. U.S. Dept. of Health & Human Servs.,* 13 F.3d 359, 360–61 (10th Cir.1993). A consultive examination should be ordered "when evidence in the record establishes the reasonable possibility of the existence of a disability and the result of the consultative exam could reasonably·be expected to be of material assistance in resolving the issue of disability." *Hawkins v. Chater,* 113 F.3d 1162, 1165 (10th Cir. 1997).

On the record before the ALJ, there was evidence from Dr. Schaeffer that Siegle had a possible diagnosis of borderline intellectual functioning, and that his ability as to basic work related activities "seemed to show some limitations in understanding, in memory and sustain concentration, persistence and pace, and social interaction and adaptation." Record, at 138. Additionally, Siegle testified that he had been

in special education, and that he had trouble reading.[7]

Under these circumstances, I do not find that the ALJ failed to adequately develop the record. Even had Dr. Schaefer found that Siegle suffered borderline intellectual functioning, such a finding would not qualify Siegle for Listing 12.05C. *See Frazee v. Barnhart*, 259 F.Supp.2d 1182, 1200 (D.Kan.2003) (*citing* DSM–IV at 684) (IQ in 71–84 range indicates borderline intellectual functioning). Additionally, the ALJ elicited testimony from Siegle that he was able to read and understand the sports page. Record, at 23. Finally, the IQ score Siegle provided to the Appeals Council was 74 (a score which the test-giving psychologist thought understated Siegle's actual IQ), which would not qualify Siegle for Listing 12.05C. Record, at 244, 255. Under the circumstances, it was not reasonable to suspect that Siegle's IQ was so low that he might qualify for Listing 12.05C. *See Hawkins*, 113 F.3d at 1168 (in developing the record, the ALJ need only exercise "reasonable good judgment"). For the same reasons, the ALJ's determination that Siegle did not meet Listing 12.05C, even considering the school records, is not erroneous.

 In his reply brief, Siegle also argues that the ALJ failed to consider the loss of function in his hands and arms, under Listing 1.00B. However, the ALJ explicitly found that Siegle was not so limited, and his finding is supported by Dr. Finch's finding that his "feeling, fingering, and dexterity are normal." *See* Record at 132.

 Siegle also asserts that the ALJ failed to consider the cumulative effect of his impairments. *See Langley v. Barn-*

hart, 373 F.3d 1116, 1123 (10th Cir.2004) (*citing* 20 C.F.R. § 404.1523) (remanding on the basis that the ALJ's decision did not indicate that he considered the cumulative effect of claimant's impairments). Although the ALJ found that Siegle suffered from five separate impairments, there is no indication that he considered the cumulative effect of these impairments. Additionally, Dr. Schaeffer opined that "it is quite evident that the severity of his pain is increased by psychological factors." Record, at 138.

Neither the regulations nor the case law make it clear what an ALJ must do in order to demonstrate that he has considered the cumulative effect of a claimant's severe impairments. However, at the least, the ALJ should have explicitly considered the statement by the consulting psychiatrist that Siegle's physical and psychological conditions acted together to affect his perception of the severity of his pain. *See Clifton v. Chater*, 79 F.3d 1007, 1009–10 (10th Cir.1996) (ALJ must "discuss[ ] the evidence supporting his decision, ... the uncontroverted evidence he chooses not to rely upon, [and] significantly probative evidence he rejects"). Consequently, I find that the ALJ's decision does not demonstrate that he considered the cumulative effects of Siegle's disabilities.

3. *Prior Relevant Work as Small Parts Assembler*

Siegle argues that Plaintiff failed to ask about the work demands of his previous assembler job on a "function-by-function" basis, including by asking specifically about the jobs requirements as to sitting,

---

7. Siegle provides no authority that I may find, on the basis of new evidence, that the Appeals Council erred in finding that the ALJ adequately developed the record, and my independent research revealed no such authority.

*See O'Dell v. Shalala*, 44 F.3d 855, 859 (10th Cir.1994) (new evidence "becomes part of the administrative record to be considered when evaluating the Secretary's decision for *substantial evidence* ") (emphasis added).

standing, walking, lifting, carrying, balancing, stooping, handling, fingering, reaching, reading, writing, and short term memory requirements.

In making a step four determination, the ALJ must "make findings regarding the physical and mental demands of the claimant's past relevant work." *Winfrey v. Chater*, 92 F.3d 1017, 1024 (10th Cir.1996). To make these findings, "the ALJ must obtain adequate 'factual information about those work demands which have a bearing on the medically established limitations.'" *Id.* (*quoting* SSR 82–62).

Here, the ALJ elicited testimony from Siegle that he sat when he worked as a small parts assembler, and from the VE that in the job required lifting no more than 20 pounds on an occasional basis; sitting, standing, and walking at least four hours, although employers often allowed alternating sitting and standing at will; no climbing, stooping, kneeling, balancing, crouching, or crawling; no reaching above the shoulder; the ability to follow very short and simple instructions; and no contact with the public and only occasional contact with co-workers. *Id.* at 290–91. According to the Dictionary of Occupational Titles § 739.687–030, the position has reading requirements of understanding the meaning of 2,500 words and reading at the rate of 95–120 words per minute.

It is not clear from the record whether the ALJ was aware of and/or considered these requirements. However, the record contains no indication that Siegle's ability to read has declined since he previously worked as a small parts assembler, and I consequently find that the ALJ did not err by failing to address the reading requirements of the job.

### 4. Credibility

Finally, Siegle argues that the Commissioner's determination that he was not credible is erroneous, because his subjective allegations of disabling pain were supported by substantial evidence. "Credibility is the province of the ALJ," *Hamilton*, 961 F.2d at 1499, and an ALJ's credibility determinations are generally treated as binding on review. *Gossett v. Bowen*, 862 F.2d 802, 807 (10th Cir.1988). Siegle essentially asks me to reweigh the evidence, which I may not do. *See Hamilton*, 961 F.2d at 1499 (rejecting claimant's argument that ALJ ignored positive evidence of his credibility). The ALJ properly noted inconsistencies in Siegle's testimony, that Dr. Finch observed him moving with a normal range of motion when not being examined, and that Dr. Schaeffer suspected symptom magnification.

Additionally, Siegle appears to argue that the findings of "the Commissioner's paid consultants;" i.e., Drs. Finch and Schaefer, cannot constitute substantial evidence. This argument is not supported by Tenth Circuit precedent. *See Diaz v. Sec'y of Health & Human Servs.*, 898 F.2d 774, 777 (10th Cir.1990) (upholding ALJ's credibility determination which relied in part on suspicion of consulting physician that claimant was malingering).

However, Siegle also argues that the ALJ failed to properly analyze his complaints of subject pain under *Luna v. Bowen*, 834 F.2d 161 (10th Cir.1987). Under *Luna*, to analyze a claim of disabling pain, a court must consider: (1) whether claimant established a pain-producing impairment by objective medical evidence; (2) if so, whether there is a loose nexus between the impairment and claimant's complaints of pain; and (3) if so, whether considering *all the evidence*, both objective and subjective, claimant's pain is in fact disabling. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir.1994) (emphasis added). Assuming the first two prongs are met, an ALJ should consider:

the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of non-medical testimony with objective medical evidence.

*Kepler v. Chater,* 68 F.3d 387, 391 (10th Cir.1995) (quoting *Thompson v. Sullivan,* 987 F.2d 1482, 1489 (10th Cir.1993)).

■ It appears undisputed that Siegle fulfilled the first two prongs. Regarding the third, although the ALJ provided a boilerplate list of the *Luna/Kepler* factors, I cannot determine from the his decision that he actually considered these factors. The ALJ does not mention Siegle's medications, frequency of medical contacts, or his non-medical attempts, such as his pacing in his driveway, to obtain relief from his pain.

More importantly, to the extent he did address the *Luna/Kepler* factors, many of his findings are not "closely and affirmatively linked to substantial evidence." *Winfrey v. Chater,* 92 F.3d 1017, 1020 (10th Cir.1996). For instance, although the ALJ briefly describes Siegle's daily activities, he does not indicate if and how these daily activities are inconsistent with Siegle's allegations, and they do not appear to be so. *See Hamlin,* 365 F.3d at 1221 (internal quotation omitted) ("[n]or may an ALJ rely on minimal daily activities as substantial evidence that s claimant does not suffer disabling pain"). Additionally, the ALJ notes that "the clinical notes of the claimant's treatment providers also show that the claimant has presented with inconsistent complaints" but provides no details or citations to the record. Record, at 25. In fact, the only visits with Kaiser, Siegle's primary healthcare provider, mentioned in the ALJ's decision are the March 2002 visit with Dr. Mulica, and a February 2003 visit with a physical therapist whom the ALJ erroneously identifies as a physician. Record at 24–25. As described above, Siegle saw three other M.D.'s at Kaiser, including a neurosurgeon, Dr. Colapinto, for his condition and the ALJ should have at least noted this. Finally, the ALJ stated that Siegle's objective findings are "minimal and inconsistent," but supports this only with Dr. Finch's observation that Siegle was later observed outside of the clinical setting portraying a normal range of motion. *Id.* at 25. I agree with the ALJ that this is highly probative of Siegle's credibility; however, it does not indicate that the objective findings in the record were "minimal and inconsistent," and the ALJ points to no other problematic findings.

Finally, although Dr. Schaeffer opined that he suffered from a "pain disorder due to both psychological factors and a general medical condition," and that "it is quite evident that the severity of his pain is increased by psychological factors," Record at 138, the ALJ's failed to consider "the possibility that psychological disorders combine with physical problems." *Winfrey,* 92 F.3d at 1021 (finding that ALJ erred by not considering claimant with a somatoform disorder, along with claimant's depression and anxiety disorders, affected his perception of pain). Accordingly, because I cannot determine from the ALJ's decision that he properly analyzed Siegle's complaint of disabling pain under *Luna v. Bowen,* this case must be remanded.

### Conclusion

Based upon my review of the record in this case, I find that the ALJ's determination that the ALJ failed to properly assess the cumulative effect of Siegle's impair-

ments and his allegations of disabling pain. Accordingly, the determination that Siegle is not disabled is reversed and remanded for proceedings consistent with this opinion, in particular the proper determination of the cumulative effect of Siegle's impairments and his allegations of disabling pain.