**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

MARIO J. GUTIERREZ,

    Plaintiff - Appellant,

v.

COMMISSIONER, SSA,

    Defendant - Appellee.

No. 18-4162
(D.C. No. 2:17-CV-00269-PMW)
(D. Utah)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **EID**, **KELLY**, and **CARSON**, Circuit Judges.
_____

Mario J. Gutierrez appeals from a district court order that affirmed the

Commissioner's denial of his applications for disability insurance benefits (DIB) and

supplemental security income (SSI). He argues that the administrative law judge (ALJ)

who reviewed his case improperly discounted supporting medical opinions and failed to

make findings about the mental demands of his prior work. Exercising jurisdiction under

28 U.S.C. § 1291 and 42 U.S.C. § 405(g), we affirm.

---

[*] After examining the briefs and appellate record, this panel has determined
unanimously to honor the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
submitted without oral argument. This order and judgment is not binding precedent,
except under the doctrines of law of the case, res judicata, and collateral estoppel. It
may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1
and 10th Cir. R. 32.1.

## BACKGROUND

Gutierrez has a GED and has worked as a roofer and a production assembler. He claims he became disabled in December 2012 based on an incident in August 2005, when police tasered him after a minor car accident. Hospital records show Gutierrez exited the car "brandishing [an] AK-47," was tasered, and fell backward, hitting his head. Aplt. App., Vol. II at 449. Medical professionals diagnosed him with alcohol intoxication, anxiety, cerebral contusion, and a "possible small subarachnoid hemorrhage." *Id.*, Vol. III at 618; *see also id.*, Vol. II at 453. Medical records reveal no sign that Gutierrez lost consciousness during the incident and a CT scan showed "no evidence of intracranial pressure." *Id.*, Vol. III at 627. Doctors released him the next day, determining he was "neurologically intact." *Id.* at 622, 624.

Two weeks later, neurologists Samuel Browd, M.D., Ph.D., and William Tupper Couldwell, M.D. examined Gutierrez for headaches, nausea, and "some memory trouble." *Id.* at 622; *see also id.*, Vol. II at 461. They concluded his headaches, nausea and memory problem were "consistent with a concussion syndrome" and would be temporary. *Id.*, Vol. III at 622; *see also id.*, Vol. II at 461. They also reported that when Gutierrez was in the hospital, they had "reviewed his films and called into question whether there was any traumatic subarachnoid hemorrhage." *Id.*, Vol. III at 622. Drs. Browd and Couldwell instructed him to return for another appointment in two months if his symptoms did not resolve. Medical records show no further appointments with these doctors.

2

Nearly eight years later, in May 2013, Gutierrez went to a health clinic for completion of a Medicaid disability form. His chief complaint was "head trauma." *Id.*, Vol. II at 394. A physician's assistant interviewed Gutierrez, noting that upon being tasered in 2005, Gutierrez was "brought to hospital - - treated and released - - no other medical care." *Id.* She diagnosed migraines and insomnia/excessive sleepiness, and she noted he was "able to function" on "[i]buprofen or tylenol." *Id.*

In July 2013, Gutierrez underwent psychological testing in support of applications for state assistance. Gutierrez reported to Liz McGill, Ph.D, that his fall in 2005 caused severe brain swelling, a three-day coma, "and 3 drills into [his] skull to release pressure." *Id.* at 329. Dr. McGill concluded that he had a borderline IQ and had sustained a traumatic brain injury leading to dementia and a mood disorder. Although she did not conduct the testing herself, she signed the examiner's report, which revealed Gutierrez's test scores and stated that because he had exhibited "less than adequate effort on some tasks," his "results [were] considered to be a possible underestimate of current cognitive functioning." *Id.*, Vol. II at 332. Finally, Dr. McGill checked a box on Gutierrez's "General Assistance" form generically stating he could not "work[ ] at all, in any occupation," *id.* at 324. She wrote on his Medicaid form that it was "at most likely [that] part time work will be his optimal," *id.* at 331.

In December 2013, Joseph Nelson, D.O., physically examined Gutierrez for his DIB and SSI claims. Gutierrez "complain[ed] of headaches, dizziness, shortness of breath, difficulty sleeping, loss of appetite, weight loss, depression and nervousness." *Id.* at 363. He claimed that after he fell and hit his head, "he lost consciousness for 20

3

hours," but he denied having any surgery. *Id.* at 362. Dr. Nelson's physical exam revealed "no evidence of debilitating headaches, post-concussion syndrome or fatigue that would limit [Gutierrez's] ability to work." *Id.* at 366.

In July 2014, Gutierrez began seeing Karly Pippitt, M.D., for his headaches. Following an interview and examination, Dr. Pippitt reported "[n]o known surgical history," and she concluded that Gutierrez suffered from, as relevant here, "[c]hronic post-traumatic headache[ ] with migranous feature," "[m]edication overuse headache," and "[p]ost concussive syndrome." *Id.*, Vol. III at 640, 643. She prescribed a pain reliever, muscle relaxant, and anti-nausea/anti-migraine medications. At an October 2014 follow-up visit, Dr. Pippitt noted that Gutierrez was "doing much better in terms of his chronic headache," he had "broken his cycle of medication overuse headache," and he was "able to abort his migraines successfully with [an anti-migraine medication]." *Id.* at 654.

In February 2015, Gutierrez underwent a mental-health assessment in support of his DIB and SSI applications. The mental-health counselor, Jamal Barakat, questioned Gutierrez's claims that he suffered from dementia and post-traumatic concussion syndrome, and he stated that Gutierrez's "motive[ ] for [treatment] is unclear and it could be related to his attempt to get [disability benefits]." *Id.*, Vol. IV at 755. Barakat examined Gutierrez, finding organized thoughts, proper orientation, intact concentration and memory, alertness, and appropriate affect. Barakat reported that Gutierrez "is able to work and has been meaningfully employed for the past 6 yrs as a roofer." *Id.* Barakat diagnosed non-specific mood, personality, and anxiety disorders.

4

State agency physicians reviewed Gutierrez's medical records for his DIB and SSI claims. Drs. Philip Cali and Joan Zone found that Gutierrez suffered from a cognitive impairment that posed moderate limitations in carrying out detailed instructions, maintaining attention/concentration for extended periods, completing a normal workday/workweek, and performing at a consistent pace. Even so, Drs. Cali and Zone concluded that those limitations would not preclude simple, routine work.

The ALJ held a hearing, taking testimony from Gutierrez, medical expert Dr. Ronald Houston, and vocational expert (VE) John Hurst. Gutierrez testified that the 2005 fall had caused migraines, irritability, anxiety, insomnia, restlessness, and memory/comprehension problems. Dr. Houston testified he relied on Dr. McGill's diagnostic workup to conclude that Gutierrez suffers from borderline IQ and traumatic brain injury resulting in dementia and mood disorder. Dr. Houston described Gutierrez's (1) daily-living activities as mildly impaired, (2) social interactions as moderately limited, and (3) persistence and pace as markedly limited. He opined that upon the injury in 2005, Gutierrez met the listing of impairments for a chronic organic mental disorder, and he explained that while traumatic brain injuries generally improve within a year or two, Gutierrez "may have some residual impairments because he did have a subarachnoid hemorrhage . . . [and] a loss of consciousness." *Id.*, Vol. I at 71. Finally, VE Hurst testified that a hypothetical claimant with Gutierrez's age, education, and work experience could work as a production assembler even if able to follow only short and simple instructions, make only simple work-related judgments and decisions, and have only occasional changes in a routine work setting.

5

After the hearing, the ALJ reviewed the evidence and found Gutierrez not disabled. In doing so, the ALJ determined that Gutierrez suffers from four severe impairments: headaches, remote traumatic brain injury, unspecified mood disorder, and unspecified anxiety disorder. The ALJ concluded that Gutierrez did not meet a listed impairment, however, and that Dr. Houston's contrary opinion was entitled to "little weight" because Dr. Houston's "evaluation of the evidence was cursory"; Gutierrez had not used full effort during testing with Dr. McGill; "[Gutierrez's] injury [wa]s too remote and the record show[ed] he held many jobs since his original injury"; and "[a]t the time of the head injury [Gutierrez] received very minimal treatment and there was virtually no follow up." *Id.* at 32.

The ALJ also gave little weight to Dr. McGill's opinions about Gutierrez's work abilities, stating they concerned a matter reserved to the Commissioner. The ALJ observed that Dr. McGill had not explained her opinions and had cautioned that Gutierrez's test results likely underestimated his cognitive functioning.

In contrast, the ALJ gave "great weight" to the opinions of Dr. Nelson, who had physically examined Gutierrez, and Drs. Cali and Zone, who had reviewed Gutierrez's medical records. *Id.* at 32, 33.

Finally, the ALJ turned to Gutierrez's residual functional capacity (RFC). The ALJ determined Gutierrez could perform a full range of work at all exertional levels so long as it involved only (1) short and simple instructions; (2) simple work-related judgments/decisions; and (3) occasional changes in a routine work setting. Based on that

6

RFC and the VE's testimony, the ALJ concluded that Gutierrez could perform his past work as a production assembler, and therefore, he was not disabled.

The district court affirmed, prompting this appeal.

## DISCUSSION
### I. Standards of Review

"We review the district court's decision de novo and independently determine whether the ALJ's decision is free from legal error and supported by substantial evidence." *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Frantz v. Astrue*, 509 F.3d 1299, 1300 (10th Cir. 2007) (internal quotation marks omitted).

### II. Medical Opinion Evidence

Gutierrez argues that the ALJ erred in giving little weight to the opinions of Drs. McGill and Houston.

### A.     Dr. McGill

An ALJ may dismiss or discount an examining physician's medical opinion after evaluating the factors in 20 C.F.R. § 404.1527(c) and § 416.927(c). *Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012). Those factors include the nature, extent, frequency, and length of the treatment relationship; the supportability of the medical opinion; the consistency of the opinion with the record as a whole; whether the opinion relates to the physician's specialty; and other factors that tend to support or detract from the opinion. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c). A physician's opinion that a

7

claimant cannot work carries no "special significance," as it relates to an issue reserved to the Commissioner. *Id.* § 404.1527(d)(3); 416.927(d)(3).

Here, the ALJ discussed Dr. McGill's limited involvement with Gutierrez, her failure to explain the conclusions she reached, her opinions about Gutierrez's ability to work, and Gutierrez's limited testing effort. Gutierrez first challenges the ALJ's rejection of Dr. McGill's opinions about his work abilities. Gutierrez suggests that a physician invades the Commissioner's province only by opining that a claimant is "disabled." Aplt. Opening Br. at 14. The regulations, however, designate many issues reserved for the Commissioner, such as the claimant's ability to work. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d).

Next, Gutierrez argues that "Dr. McGill's explanations for her conclusions are found in her lengthy examination report and are supported by the results of testing that she supervised." Aplt. Opening Br. at 15. But Dr. McGill's two-and-a-half page examination report mostly quotes Gutierrez's own description of his injury and symptoms. And we see no basis to construe Gutierrez's test results as a substitute explanation for Dr. McGill's conclusions, where Dr. McGill acknowledged that because of a lack of testing effort, the results may underestimate Gutierrez's cognitive functioning.

Gutierrez argues that his observed lack of testing effort had no real significance. He points out that the test had both a memory and IQ component, and he complains that the ALJ erroneously downplayed his memory impairment by describing the test as "IQ tests." *Id.* at 11. Gutierrez's argument is not persuasive. The observed lack of testing

8

effort concerned the entire psychological evaluation, and applied "particularly [to] memory related tasks," Aplt. App., Vol. II at 332. The ALJ's shorthand characterization of the evaluation as "IQ tests" is not reversible error.[1]

We conclude that the ALJ identified sufficient reasons for discounting Dr. McGill's opinions and that substantial evidence supports the ALJ's decision.

## B. Dr. Houston

Gutierrez argues the ALJ erred in giving little weight to Dr. Houston's opinions. To recap, prior to the disability hearing, Dr. Houston reviewed Gutierrez's medical records and determined he became severely mentally impaired upon his injury in 2005.[2] According to Dr. Houston, Gutierrez's mental impairment caused moderate limitations in his ability to interact socially and marked limitations in his abilities to maintain

---

[1] Gutierrez further attempts to diminish the significance of his observed lack of testing effort by stating that "Dr. Houston, who reviewed Dr. McGill's report, testified the test results were valid and were not affected by perceived waxing and waning of effort." Aplt. Opening Br. at 15 (internal quotation marks omitted). Gutierrez does not supply a record citation in support of this argument. Our review of Dr. Houston's testimony shows that he apparently believed Gutierrez displayed consistent effort, given some of the test results. Still, Dr. McGill supervised the evaluation and signed the report documenting Gutierrez's lack of effort. Dr. Houston, by contrast, had no involvement in the testing. Gutierrez has not shown the ALJ erred by noting a lack of testing effort. *See* 20 C.F.R. § 404.1527(c)(1) ("giv[ing] more weight to the medical opinion of a source who has examined [the claimant] than to the medical opinion of a medical source who has not examined [the claimant]"); *id.* § 416.927(c)(1) (same).

[2] Gutierrez does not argue the ALJ erred in determining that his impairments do not meet the criteria of a listed impairment. "Issues not raised in the opening brief are deemed abandoned or waived." *Coleman v. B-G Maint. Mgmt. of Colo., Inc.*, 108 F.3d 1199, 1205 (10th Cir. 1997).

persistence and pace. The ALJ identified four reasons in support of discounting the weight of Dr. Houston's opinions: Dr. Houston only cursorily evaluated the medical evidence; Gutierrez displayed a lack of testing effort with Dr. McGill; Gutierrez's injury was remote and he continued to work after the injury; and Gutierrez sought only minimal follow-up care for his injury.

We conclude that the ALJ did not err in assigning little weight to Dr. Houston's opinions. Those opinions were based, in large part, on Dr. McGill's diagnostic workup. But as we have already discussed, the results of her testing may have underestimated Gutierrez's cognitive functioning. Moreover, much of Dr. McGill's workup was based on Gutierrez's own description of his injury, its severity, and the resulting limitations. Indeed, Dr. McGill's report appears to be the only record evidence suggesting that he was in a coma after his fall and that physicians surgically drilled holes into his skull to relieve pressure. Most of the records suggest no surgical intervention, no period of unconsciousness, and an almost eight-year period between his injury and subsequent medical consultation for migraines.

Gutierrez's medical records support the remainder of the ALJ's bases for discounting Dr. Houston's opinions. For instance, counselor Barakat noted that Gutierrez had engaged in post-injury employment. Dr. Pippitt reported that Gutierrez had controlled his migraines with medication. Dr. Nelson examined Gutierrez and reported no severe mental impairments. Drs. Cali and Zone reviewed Gutierrez's medical records and found only moderate mental limitations.

10

In short, the ALJ identified enough reasons for discounting Dr. Houston's opinions and substantial evidence supports the ALJ's decision.

## III. Past Relevant Work

Gutierrez argues the ALJ erred in determining he could work as a production assembler. He contends the ALJ did not make the necessary findings about the job's mental demands. We disagree.

The ALJ established Gutierrez's RFC, recounted VE Hurst's testimony that Gutierrez's production-assembler job involved light and unskilled work that "was very repetitive with few changes," Aplt. App., Vol. I at 34, and then compared Gutierrez's RFC to the demands of the job, determining that Gutierrez could meet those demands. An ALJ may rely on a VE's testimony to establish the demands of a claimant's past work so long as that assessment does not occur "in the VE's head," leaving "nothing [for this court] to review," *Winfrey v. Chater*, 92 F.3d 1017, 1025 (10th Cir. 1996). *See Doyal v. Barnhart*, 331 F.3d 758, 761 (10th Cir. 2003) (holding that ALJ did not improperly delegate his duties to the VE where "he quoted the VE's testimony approvingly, in support of his own findings"). Here, the ALJ made sufficient findings on the mental demands of Gutierrez's past work.

## CONCLUSION

We affirm the district court's judgment.

Entered for the Court

Joel M. Carson III
Circuit Judge

11